MOVEMENT AGAINST DESTRUC-
TION et al.

v.

John A. VOLPE, Secretary of
Transportation, et al.

SIERRA CLUB, INC., et al.

v.

John A. VOLPE, Secretary of
Transportation, et al.

Eleanor Marie LUKOWSKI, et al.

v.

John A. VOLPE, Secretary of
Transportation, et al.

Civ. Nos. 72–1041, 71–1118, 20634.

United States District Court,
D. of Maryland.

June 22, 1973.

John C. Armor, Baltimore, Md., for plaintiffs in the MAD case.

Roger K. Garfink, Alfred H. Kreckman, Jr., W. Taylor Brown and Weinberg & Green, Baltimore, Md., for plaintiffs in the Sierra Club case.

Norman P. Ramsey, Geoffrey S. Mitchell, and Semmes, Bowen & Semmes, Baltimore, Md., for plaintiffs in the Lukowski case.

George Beall, U. S. Atty., and Jean G. Rogers, Asst. U. S. Atty., Baltimore, Md., for Federal defendants.

Francis B. Burch, Atty. Gen., Lloyd J. Hammond, Sp. Atty., State Highway Administration, Md. Dept. of Trans., and Randy H. Lee, Asst. Atty. Gen., Baltimore, Md., for State defendants.

George L. Russell, Jr., City Sol., Lawrence F. Rodowsky, and Frank, Bernstein, Conaway & Goldman, Baltimore, Md., for the Mayor and City Council of Baltimore.

Before THOMSEN and MILLER, District Judges.

PER CURIAM:

Movement Against Destruction (MAD), an organization which opposes the construction of any further segments of the Federal-aid Interstate System in Baltimore City, joined by several neighborhood organizations and individual citizens of Baltimore City, filed a complaint herein on October 10, 1972, against the Secretary of the Department of Transportation of the United States (USDoT), and Joseph M. Axelrod, Chief of the Interstate Division for Baltimore City (IDBC), a division of the State Highway Administration (SHA).[1] Plaintiffs seek declaratory and injunctive relief to prevent defendants from taking or permitting any further steps towards construction of the "3–A System", or any of its segments "until such time as defendants have established to the satisfaction of the Court that they are in full compliance with each and every one of the following statutes": The National Environmental Policy Act (NEPA);[2] The Federal-Aid Highway Act, as amended;[3] The Clean Air

1. Formerly the State Roads Commission. SHA is a division of the Maryland Department of Transportation (MdDoT).

2. 42 U.S.C. § 4331 et seq.

3. 23 U.S.C. § 101 et seq.

Amendments of 1970;[4] and The Department of Transportation Act, as amended.[5]

■ Throughout the proceedings there has been considerable controversy over what the "3–A System" really is.[6] The court has concluded, for reasons set out in this opinion, that it should be treated as a configuration of Federal-aid Interstate Highways and segments[7] thereof, built, partly built or unbuilt, in Baltimore City (plus a highway known as City Boulevard), more fully described in fn. 6. The historical background and present status of 3–A is set out in the chronological statement below.

The complaint was amended on November 29, 1972, to add additional plaintiffs, who sought to represent "the Class of Citizens of Baltimore City, wherever they live, who would be directly or adversely affected by the construction of the 3–A System". The City was granted leave to intervene and a motion for determination of the class action questions was filed.

Two other cases raising some of the same issues are pending in this Court: (1) Sierra Club, Inc. v. Volpe (now Brinegar), et al., 71–1118–M;[8] and (2) Lukowski et al. v. Volpe (now Brinegar), et al., 20634–T.[9]

At a conference on February 12, 1973, attended by Judges Thomsen and Miller and the counsel for all parties in the MAD, Sierra Club and Lukowski cases, a schedule was fixed leading to a trial on April 16, 1973. Counsel for all parties have co-operated in meeting the tight schedule.[10]

---

4. 84 Stat. 1676, amending various statutes. See particularly 42 U.S.C. § 1857 et seq.

5. 49 U.S.C. § 1651 et seq.

6. The term "system" has different meanings when used in different contexts.

 The "Interstate System" is one of the "Federal-aid systems" administered by the Federal Highway Administration under the Federal-Aid Highway Act, 23 U.S.C. § 101 et seq. See particularly § 103(e), (f) and (g), as amended in 1970. The apportionment of annual appropriations among the States is provided for in § 104.

 The so-called "3–A System", sometimes referred to as the "3–A Configuration", is not a "system", as that term is used in the Federal-Aid Highway Act. It is really a configuration which includes (1) those portions of the Interstate System lying in Baltimore City which have already been built (i. e. portions or segments of I–95 and I–83); (2) the presently proposed routes inside Baltimore City for additional portions or segments of I–95, I–83 and I–70N, to connect with the portions or segments of the same or another Interstate route already constructed either (a) in Baltimore City, or (b) from Delaware, Pennsylvania or elsewhere to the Baltimore City line; (3) the proposed routes for two spurs, I–170 and I–395, running from proposed routes for I–70N and I–95 toward or into the Central Business District (CBD) of the City, and (4) the proposed route for "City Boulevard" (not a part of the Interstate System), which describes a semi-circle around the western half of the CBD, connecting with I–170 and I–395, as well as with important city streets. See the map attached to this opinion as Exhibit A, p. 1403.

 The "10–D System", referred to in the chronological statement of facts, was a previously proposed configuration, which was superseded by 3–A in 1969.

7. The term "segment", as used in this opinion refers to a portion of one of the Interstate highways which may be considered separately for one or more of a variety of reasons.

8. After a joint hearing in that case and Ward v. Ackroyd, 71–930–M, in the spring of 1972, Judge Miller decided various issues relating to the proposed construction of I–70N through several parks in Baltimore City, see Ward v. Ackroyd, 344 F.Supp. 1202 (1972), and issued the injunction outlined in 344 F.Supp. at 1227. Other issues in the Sierra Club case remain for further consideration.

9. This case involves primarily Fells Point and other areas in east and south Baltimore. It has never come to trial, because of changes and proposed changes in the plans for the proposed highways, but has been kept alive for prompt hearing if and when necessary.

10. The circumstances calling for a prompt decision include: (1) the fact that unless construction is begun in the Franklin-Mulberry (F–M) corridor by June 30, 1973, the City will be obligated to return to the federal government millions of

After a further hearing on February 28, 1973, an order was entered wherein, after making the findings and conclusions required by Rule 23, F.R.Civ.P., the court [11] ordered that the MAD case be maintained as a class action for a specified class with respect to the issues involving the 3–A System as a whole, and for a specified class involving the F–M corridor, designating the class representatives and setting out the issues in detail. The court consolidated the Lukowski and Sierra Club cases with the MAD case for the sole purpose of the hearing and decision of the class issues involving the 3–A System as a whole.

The issues set out in the order of February 28, 1973, have been modified as a result of (1) the briefs filed in connection with plaintiffs' motion for summary judgment, which was denied, and (2) the evidence, arguments and briefs received during and after the trial.[12]

Most of those issues are really subsidiary questions or sub-issues to the two principal questions which the court must decide:

(1) Should defendants be enjoined from taking any steps toward construction of the "3–A System" or any part thereof until an Environmental Impact Statement (EIS) for the "3–A System" as a whole has been filed and approved?

(2) Should defendants be enjoined from: (a) proceeding with the contract which has been entered into for the construction of a relatively small portion of I–170 in the F–M corridor and the grading of another small portion; and/or (b) taking any further steps in connection with the construction of additional portions of I–170 in the F–M corridor?

To understand and relate the chronological statement of facts to the issues, it is necessary to have in mind the procedures which must be followed and the approvals which must be obtained before a highway may be constructed with 90% federal funds as part of the "Interstate System".

First, a route must be selected by the highway department of a state subject to approval by the Secretary of Transportation. 23 U.S.C.A. § 103(d), (e) and (f).

Next, the state highway department must submit to the Secretary for his approval a "program * * * of proposed projects" that the state wishes to construct with its portion of the funds appropriated for highway construction. 23 U.S.C.A. § 105(a). This is usually called "program approval", and is a prerequisite to reimbursement out of federal funds for *any* work in connection with a particular project. A more complete description of this procedure will be included in the discussion, below.

Then, the state highway department must submit to the Secretary for approval "such surveys, plans, specifications, and estimates for each proposed project included in an approved program as the Secretary may require". 23 U.S.C.A. § 106(a). This is known as "PS&E approval". As a prerequisite to PS&E approval for each "project", the state highway department must certify to the Secretary that it has held public hearings on the location for each project and must submit a transcript of the hearings to the Secretary. 23 U.S.C.A. § 128.[13] The requirements of § 128 will be discussed below.

---

dollars spent for site acquisitions in the F–M corridor over a period of years, and (2) the fact that planning and other preliminary work is now being done on various segments of the several highways, and that an elaborate survey now being conducted covering many facets of the problems, which should be completed late this summer, might be expanded to include additional items.

11. The term "court" as used in this opinion means the two judges.

12. The trial began on April 18 and lasted three weeks. Documents, plats and depositions, with a total thickness of about five feet were offered and have been considered. Both sides proposed findings of fact and submitted briefs.

13. Section 128(a) now provides:
"*Public hearings*
"(a) Any State highway department which submits plans for a Federal-aid highway project involving the bypassing of, or going through, any city, town, or

The regulations under the Federal-Aid Highway Act and the Federal Highway Administration's (FHWA) published directives[14] require the states to receive design approval and authorization to proceed with work, in addition to the "program approval" required by § 105(a), and the PS&E approval required by § 106(a), on each project on which reimbursement may be requested and for which a formal project agreement has been executed. See § 110(a). Advertisements for bids may then be published and construction contracts awarded.

In PPM 20–8 (Jan. 14, 1969), published in 23 C.F.R. Ch. I, pt. 1, App. A (1972), FHWA related the requirements of 23 U.S.C. § 128(a) to the project approvals necessary for federal reimbursement.[15] To achieve its stated purposes, PPM 20–8 requires states to obtain two formal FHWA approvals in addition to the project approvals necessary for federal reimbursement: (1) "location" approval, which follows "a corridor public hearing", and (2) "design" approval, which follows a "design public hearing".

PPM 90–1 (Aug. 24, 1971), was issued to implement four separate federal statutes intended to avoid or mitigate the adverse environmental impacts of the Federal-aid highway program: the National Environmental Policy Act of 1969 (NEPA); section 4(f) of the Department of Transportation Act (which is now identical to Section 138 of the Federal-aid Highway Act); section 106 of the Historic Preservation Act of 1966; and section 309 of the Clean Air Act of 1970. PPM 90–1 relates the operative provisions of each statute to the location approval and design approval requirements of PPM 20–8. "Highway agencies" are required by PPM 90–1, para. 6b, to prepare the environmental statements required by § 102(2)(C) of NEPA and to prepare information relating to the requirements of § 4(f) of the Department of Transportation Act. "Highway agency" is defined as "the agency with the primary responsibility for initiating and carrying forward the planning, design, and construction of the highway", in our case the Interstate Division for Baltimore City (IDBC), a division of the State Highway Administration (SHA)[16] of the Maryland Department of Transportation (Md.DoT).

A list of the abbreviations used in this opinion appears as Exhibit B, at p. 1404.

---

village, either incorporated or unincorporated, shall certify to the Secretary that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic and social effect of such a location, its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community. Any State highway department which submits plans for an Interstate System project shall certify to the Secretary that it has had public hearings at a convenient location, or has afforded the opportunity for such hearings, for the purpose of enabling persons in rural areas through or contiguous to whose property the highway will pass to express any objections they may have to the proposed location of such highway. Such certification shall be accompanied by a report which indicates the consideration given to the economic, social, environmental, and other effects of the plan or highway location or design and various alternatives which were raised during the hearing or which were otherwise considered."

The requirement for consideration of social effect, environmental impact and consistency with the affected community's goals and objectives of urban planning, was added in 1968. Pub.L. 90–495, § 24, Aug. 23, 1968, 82 Stat. 828.

14. 23 C.F.R. § 1.12 (1972), and PPM 21–1.

15. The stated purposes of PPM 20–8 are "to ensure, to the maximum extent practicable, that highway locations and designs are consistent with Federal, State and local goals and objectives", and "to afford full opportunity for effective public participation in the consideration of highway location and design proposals by highway departments before submission to the Federal Highway Administration for approval."

16. Formerly the State Roads Commission.

This opinion will constitute the court's findings of fact and conclusions of law.

### Chronology

By the early 1940's traffic engineers in Baltimore realized that merely improving existing streets would not provide long term solutions to moving traffic into and out of Baltimore. An Advisory Engineers' Report in 1942 recommended (1) a bypass route to take care of through traffic, and (2) a crosstown freeway utilizing the F-M corridor west of the Central Business District (CBD) and connecting with a bypass route near the eastern City line, to provide access to commercial and residential centers. In each year from 1943 through 1946 modifications of that plan were proposed by various groups.

In 1949 the Planning Commission of Baltimore City (PCBC) published "A Tentative Master Transportation Plan", which included, inter alia: a ring around the CBD, with a western leg utilizing the F-M corridor, and a bypass route running from the Baltimore-Washington Parkway across Locust Point and the Patapsco River to Canton and the east. It also proposed the Jones Falls Expressway (JFX), which now brings I-83 from the Beltway to the northern edge of the CBD. In 1951 City voters approved a $10,000,000 bond issue to start construction of the JFX.

In 1957, shortly after the passage of the Federal-aid Highway Act, SHA submitted and had approved by FHWA route descriptions for proposed Interstate Highways in Maryland. These included a route from Baltimore to the Pennsylvania line, south of York (I-83), a route from the District of Columbia line to Baltimore and from Baltimore to the Delaware line, east of Elkton (I-95) and a route from the Pennsylvania line near Hancock, via Hagerstown and Frederick to Baltimore (I-70 and I-70N). The route maps accompanying the route descriptions established a control point in an area somewhere in the geographical center of the City for the intersection of the three routes. The I-70N portion of the configuration was an extension of the west radial in the 1949 plan, and utilized the F-M corridor.

In 1960 PCBC proposed an expressway configuration known as the "Harbor Route", which included a crossing of the Inner Harbor by I-95 to connect with JFX and an inner loop around the CBD, which would connect with the F-M corridor, as part of I-70N.

In 1961 a study made by a joint venture of consulting engineers (the Expressway Consultants) proposed the 10-D configuration. 10-D continued to use the F-M corridor for I-70N, but added a connection between I-70N and I-95 near the Camden Industrial Park by means of a corridor west of Fremont Avenue. 10-D also included an Inner Harbor crossing and an interchange with I-83 in the vicinity of Fells Point. I-95 was to continue through Fells Point and Canton and up to the east City line to connect with the Harbor Tunnel Thruway. This study caused considerable debate throughout the City. In January 1962 PCBC approved 10-D with designated areas for restudy.[17]

On January 30, 1962, the location hearing [18] on the F-M corridor was held. It covered the then proposed East-West Expressway, of which F-M was a part.[19]

In 1963 the Regional Planning Council (RPC) was established as an independ-

17. State and Federal transportation officials felt they should wait for the results of a Baltimore Metropolitan Area Transportation Survey (BMATS) by Wilbur Smith and Associates then underway before approving 10-D.

18. Required by 23 U.S.C. § 128.

19. There were no limitations on public comment at this hearing. The public comment included discussion of the social and environmental, as well as economic, effects of the proposed highway. Concern was expressed over the problems caused by the displacement of large numbers of people, over noise and air pollution, and over the need to protect churches, historic places and parkland. Suggestions were made for the reservation of rights-of-way for mass transit.

ent state agency by the Maryland General Assembly, which cited the following reasons for its action:

"The rapid urbanization of the area which includes Baltimore City and Anne Arundel, Baltimore, Carroll, Harford and Howard Counties has resulted in the creation of serious problems. Sixty percent of the population of Maryland resides in this area. During the past ten years, the population of the region has increased by one-third. It is anticipated that this trend will continue, further aggravating the problems. The economy and well-being of the area are best advanced when the economic potential is considered and developed on a regional and statewide basis. An opportunity must be provided for the several units of government within the area to work together with the state and private agencies toward the solution of their problems.

"In order to deal with these matters on a rational and sound basis, they must be considered within the framework of a general development plan for the area. Thus, the Regional Planning Council is required to prepare a suggested general development plan—a plan which will provide for the effective employment of the natural and other resources of the region —and which will assure a continuous comprehensive planning process within the region.

"The Regional Planning Council serves as a coordinating agency (1) seeking to harmonize and advance its planning activities with the planning activities of the state and of the counties and municipalities within the metropolitan area, (2) rendering planning assistance, (3) stimulating public interest and participation in planning for the development of the area, (4) serving as the referral agency for problems affecting more than one unit of government, and (5) reviewing local government programs and federal grant-in-aid requests when required by law.

"The Regional Planning Council's 26-member policy board is comprised of two top elected officials and a representative of the planning agency of each of the six member jurisdictions, two members-at-large and the secretaries of four state departments, a member of the State Senate and a member of the House of Delegates. The policy board meets once a month, and is responsible for recommendations on general planning, economic development, comprehensive health, transportation, land use, open space and the natural environment, housing, criminal justice, water and sewer facilities and library planning."

RPC, with minor modifications in its membership, and with the addition of non-voting representatives from U. S. agencies (FHWA and Department of Housing and Urban Development) and observers from other state agencies, has continued to function substantially as planned, until the present time.

The Transportation Technical Committee (TTC), an advisory committee to RPC, is composed of the heads of the various local and State agencies concerned with land use and transportation. These include Md.DoT, SHA, MTA,[20] and the heads of the planning, traffic engineering, and public works departments of the six jurisdictions in the Baltimore Region, as well as representatives of RPC.[21]

---

20. These initials refer to the former Metropolitan Transit Authority and the present Mass Transit Administration.

21. The basic responsibilities of TTC are: 1. to provide overall guidance in the formulation of technical policy on transportation and land use matters, 2. to provide technical guidance and assistance to the local governments in the development of their transportation plans and programs, 3. to recommend the allocation of available technical services and resources by and for its members, 4. to determine those matters which fall within the scope of the Transportation Planning

On February 1, 1964, Federal and State officials announced their "approval" [22] of a route beginning at the west City line, running through Leakin Park, easterly through the F–M corridor, then southerly using a proposed Myrtle-Pine corridor, a proposed Lee-Hill corridor and a proposed Inner Harbor crossing to describe a half-circle south of the CBD, then easterly (generally along Boston Street) and northerly to connect with the Kennedy Highway, part of I–95 leading to Delaware.

The BMATS report, rendered April 1, 1964, surveyed the existing traffic conditions and included an origin-destination survey. The development characteristics of the Baltimore region were analyzed, along with the travel characteristics. Trip distribution for 1980 was projected, as well as future growth in the region. Future traffic facility needs were analyzed and alternative highways plans tested.[23] BMATS recommended a master highway plan, including 48 miles of freeway within the City of Baltimore. These included use of the F–M corridor as part of I–70N, a loop around the CBD, and an Inner Harbor crossing of I–95.

The BMATS report proposed a format for a continuing transportation planning process, to provide updated study data, which could be introduced into the decision making process as necessary.

On October 15, 1964, the consulting engineering firm of Parsons, Brinckerhoff, Quade and Douglas (Parsons) submitted to MTA its Phase II report, a long range program for Baltimore area mass transportation.[24] The Parsons' study was coordinated with other transportation planning in the Baltimore region through a Steering Committee chaired by the Director of the State Department of Planning.[25]

Both BMATS and Parsons used the same land use data obtained from the RPC. The Parsons' Mass Transit Plan was based upon the assumption that the highway configuration (10–D) recommended by the BMATS study of 1964 would be in effect. The all-bus transit alternative and the commuter railroad alternative were rejected for reasons stated in the report.

The Parsons' report recommended for 1985 a rapid rail transit system composed of an inner-city loop, a northwest

Process, 5. to promulgate regional transportation development objectives, 6. to assure the coordination of the transportation works programs, 7. to review, approve, and recommend adoption of plans and submit recommendations to the participating agencies and governing bodies, and 8. to review and, if necessary, to make recommendations to the Regional Planning Council to modify the Transportation Planning Process.

22. That "approval" effected a change in the intermediate control point for the general interstate route configuration.

23. With respect to rapid transit, the BMATS report noted that: (a) freeway systems cannot obviate the need for transit facilities and neither can transit be substituted for freeways; (b) the potentials of the Baltimore area for rapid transit would be detailed in the course of the transit study then under way; (c) rapid transit would probably not diminish the basic need for an area wide urban freeway system; transit may serve to diminish lane requirements on radial routes but is not likely to relieve circumferential

traffic; (d) it was anticipated that future rapid transit in the Baltimore area must be related to the CBD.

The BMATS report recommended provision of adequate rights-of-way to accommodate future transit lanes in six individual segments of the proposed freeway network and recommended geometric cross-sections which indicated the proposed reservation of at least two lanes in the median strips of radial freeways for future exclusive transit lanes.

24. The first phase of Parsons' work had been recommendations for improvements in the bus system. Phase II was a study of the feasibility of alternative public transportation systems together with a recommendation among the alternatives.

25. The committee included the Chairman-Director of SHA, the Commissioner of Transit & Traffic for Baltimore City and the Directors of MTA, RPC and the Baltimore Urban Renewal and Housing Authority (BURHA), the predecessor of the Department of Housing and Community Development of the City (HCD).

radial and a northeast radial. For long range purposes beyond 1985 a six legged rapid rail system was proposed.

The Parsons' report recognized the need for balanced transportation and stated that "no single means of transportation is sufficient itself". With respect to the need for expressways, the Parsons' report stated:

"Though it is beyond the scope of this Report to comment on any specific highway alignment or development, nevertheless it is considered essential that express transportation for motor vehicles be provided by a comprehensive limited access highway network. Such a system is fundamental to providing for movements between the dispersed residential areas and dispersed employment locations that characterize the area. In the view of the Consultant, such a system will be vital to the economic health and growth of the Greater Baltimore community."

Location approval for the F–M corridor was requested and granted in 1965.

On February 16, 1966, by agreement between SHA and the City, the Interstate Division for Baltimore City (IDBC)[26] was created to manage the construction and completion of the Interstate System highways in Baltimore.

On June 20, 1966, a Federal Aid Project Agreement[27] was entered into between SHA and FHWA for the acquisition of rights-of-way in the F–M corridor from the Pennsylvania Railroad (on the west) to Fremont Avenue (on the east).[28] The Federal funds made available under that agreement amounted to $6,595,229. The agreement was subject to the following provision:

"In the event that actual construction of a road on this right-of-way is not undertaken by the close of the seventh fiscal year following the fiscal year in which this agreement is executed, the State highway department will repay to the Bureau of Public Roads the sum or sums of Federal funds paid to the highway department under the terms of this agreement."

On September 15, 1967, RPC adopted a suggested General Development Plan (GDP) for the Baltimore Metropolitan Region, i.e. Baltimore City and Anne Arundel, Baltimore, Carroll, Harford and Howard Counties. The 1967 GDP included freeways within Baltimore City, which were roughly the 10–D configuration.[29]

The 1967 GDP also included the rapid rail transit system proposed by Parsons, with extensions, as part of a "balanced

---

26. A division of SHA of Md.DoT.

27. The term "project" may refer to various items of work, such as planning, surveying, right-of-way acquisition, demolition, grading, paving, etc., or to various lengths of a highway, submitted by a state to obtain FHWA approval necessary for federal reimbursement. See 23 U.S.C. § 101 (a) and 23 C.F.R. § 12(b) (1972). A "program of projects" (or several such programs) may be submitted annually by SHA to FHWA. 23 U.S.C. § 105.

28. There were a total of 609 properties in F–M. As of January 14, 1969, IDBC had purchased 43 commercial properties and 496 residential properties for right-of-way in the corridor. Of those properties acquired, almost all were demolished or under contract to be demolished by that date. At the present time, all of the properties in F–M have been acquired

by negotiations and/or condemnation proceedings. School No. 176, located in the corridor, is owned by the City. The plans for that school are contained in the "Discussion" relating to the F–M corridor later in this opinion. Aside from the school, the only buildings left standing in the corridor between Pulaski Street on the west and Myrtle Avenue (beyond Fremont Avenue) on the east, are three houses on Carrollton Avenue being used as HCD offices, and one commercial property, 802 West Mulberry Street. Nine hundred and sixty families have been relocated by HCD from F–M.

29. The 1967 GDP projected I–70N from the west City line into the City, through the F–M corridor, then bifurcating, one branch, west of the CBD, heading south and east to a junction with I–95 and another branch heading northeasterly to a junction with I–83.

transportation system". The RPC stated: "The Plan encourages the continued redevelopment and revitalization of central Baltimore—to provide a strong central core and serve as the regional focus for major commercial, financial, institutional and cultural activities".

In the same year, 1967, the American Institute of Planners and the American Institute of Architects complained that the existing 10-D alignment was not responsive to the new concepts for social, environmental and economic improvement of the City. A committee headed by a Baltimore architect recommended the formation of a conceptual design team to design the highways.

On October 3, 1967, an inter-disciplinary team, known as the Urban Design Concept Associates (UDCA), was organized under contract with SHA.[30] The stated objective of the arrangement was to "assure that the Interstate System within the City will provide for the social, economic and aesthetic needs of the City's environments as well as provide an efficient transportation facility". UDCA included highway, traffic and transit engineers, architects and urban planners, supplemented by consultants in urban land economics, sociology, landscape design, community relations and other disciplines. The application of the inter-disciplinary approach to the development of a highway project encompassing all interstate routes within a major city was a novel experiment.[31]

In June 1967 RPC engaged Daniel, Mann, Johnson and Mendenhall, consulting engineers (DMJM) to conduct a further feasibility and preliminary engineering study of rapid transit.[32] Liaison was established between UDCA and DMJM.[33]

During the DMJM study, an associate consultant, Alan Voorhees, reported on a study entitled "Travel Forecasting and Patronage and Revenue Estimates for Baltimore Region Rapid Transit System." This study undertook a "modal split" projection between transit and other types of trips.[34] The Voorhees

---

30. It was composed of (1) the architectural firm of Skidmore, Owings and Merrill, (2) the Parsons firm, which had done the mass transit studies, (3) Wilbur Smith & Associates, which had done the BMATS study, and (4) J. E. Greiner Company, which had been one of the expressway consultants of the early 1960's.

31. The UDCA Contract of 1967 provided for certain "givens" to which UDCA were to accommodate their work. These were the then fixed alignment and grade, as well as right-of-way, for I-95 from the southwest city line to DeSoto Road (since constructed), I-95 from Eastern Avenue to Kennedy Expressway (now under construction), and I-83 (JFX) from Biddle Street to Baltimore Street. For the remaining segments of I-95, I-83 and I-70N, a given was the "right-of-way * * established by City right-of-way ordinance". A third given was the corridor approval of I-95 from Monroe Street to the I-70N intersection at Montgomery and Hanover Streets. These givens generally described the 10-D configuration.

The "givens" were a starting base for UDCA. They were to examine 10-D to see whether or not it could be improved socially, environmentally and economically. It gave them an area which had already been reasonably well established and was substantially covered by established condemnation corridors. The first mission of UDCA was to identify areas in which there would be negative environmental, social or economic impacts which could not be accommodated within configuration 10-D.

32. The DMJM Mass Transit Plan of 1968 was based upon the highway configuration of the 1967 GDP.

33. Early in its study, UDCA concluded from data on trips into and across the City that two east-west freeways, as well as a north-south freeway, were needed by 1980. This was the initial design year and was later shifted to 1990. In this connection, the BMATS data was updated. The freeways identified were not specific facilities. (The study at that stage simply recognized trip desires, the gross number of vehicles moving across the community, expressed in terms of highway capacity.)

34. It was anticipated that home-based transit trips to the CBD would increase from 42% of total CBD trips in 1962 to 54% of total trips to the CBD in 1985. In terms of the whole number of home-based transit trips to the CBD, the antici-

modal split figures became available to UDCA by the spring of 1968, and were accepted by it. UDCA concluded that the results of the Voorhees modal split data did not change the need for additional freeway facilities, based on land use, commercial development, schools, employment and population distribution. In meetings of TTC during this period, the analyses and recommendations of DMJM were discussed and related to the analyses and findings of UDCA. Representatives of both groups attended some of the meetings.

The formal report of DMJM to RPC was rendered under date of July 1968. The report recommended a six-leg rapid transit system, with no CBD loop.[35] The DMJM report noted the following with respect to highway planning:

"(a) While projected travel demand will nearly double by 1985, 'only modest increases in streets and highway capacity * * * are now contemplated'.

"(b) The combined capacity of currently planned radial highways, and those which can be reasonably expected by 1985, will satisfy only a portion of the peak hour transportation needs. Without rapid transit, the already substantial peak hour congestion along radial freeways will be aggravated and compounded by clogged downtown surface streets leading to and from the freeways.

"(c) In complex urban areas such as Baltimore * * * no single transport mode can solve all problems."

On August 22, 1968, UDCA, which had been testing different possible freeway networks, reported to the Policy Advisory Board of the IDBC that the 10–D system was not sufficiently responsive to the needs of the community, because it contained two massive interchanges, one on each side of the proposed inner harbor crossing, which were too close together to provide local service ramps to the CBD. The Policy Advisory Board authorized further study of several alternate configurations or systems in Baltimore City.

On October 18, 1968, UDCA sent to the Policy Advisory Board a report referred to as a "Transportation, Environmental and Cost Summary", which evaluated several concepts and configurations for expressway routes in Baltimore City. That report was not treated as "a program of projects by FHWA" under 23 U.S.C. § 105. The purpose of the studies which resulted in the October 18, 1968, UDCA report had been to develop information on traffic, service, environmental effects, cost and engineering feasibility with respect to each of four alternative system configurations. UDCA recommended the 3–C configuration. The 3–C configuration was similar to the 3–A configuration, which was finally adopted, except that 3–A substituted a City Boulevard for a direct connection of I–70N to I–83, south of the CBD.

At a TTC meeting on November 21, 1968, Dr. Linaweaver, head of the Department of Public Works of the City (DPW), reported (1) that UDCA had recommended 3–C and (2) that SHA had requested the allocation of additional interstate mileage from FHWA for a number of highways in the State of Maryland, including additional interstate mileage for use in Baltimore City.

The RPC staff studied the UDCA report and recommended to the Mayor of Baltimore that the 3–A configuration should be recommended as superior to 3–C and the other alternatives under consideration.

On December 30, 1968, Mayor D'Alesandro asked the Chairman-Director of SHA for favorable endorsement

---

pated increase was almost 100%. Total 24-hour volumes for the west leg of rapid transit between the CBD and a proposed Fremont Avenue Station were projected to be 71,410 for 1985.

35. It concluded that revenues from the fare box would be adequate only to finance operations and maintenance, and that public subsidies would be needed to raise the funds to pay for the fixed transit system and the rolling stock.

of 3–A as the plan "most compatible with the environmental, commercial and social needs of the City".

On January 7, 1969, SHA wrote the FHWA Division Engineer advising him that on January 2, 1969, the Policy Advisory Board of IDBC had voted to endorse system 3–A, with the condition that I–70N be relocated so as not to encroach on the Rosemont community in West Baltimore. The letter requested FHWA to approve (a) authorization of additional mileage for system 3–A; (b) authorization of additional funds; and (c) inclusion of the proposed boulevard as part of the Interstate System for financing purposes.

On January 17, 1969, the Federal Highway Administrator (Bridwell) wrote SHA as follows:

"We approve, effective this date, the addition to the Interstate System of the following routes in Baltimore, Maryland. * * * Route 170. From a junction with FAI Route 70N in the vicinity of Edmondson Avenue easterly along the Franklin-Mulberry corridor to the vicinity of Fremont Avenue."

The Administrator also approved the addition of Route 395 and revisions of Interstate Routes 70N, 83 and 95, "based on Scheme 3–A" as developed by UDCA and stated: "New descriptions are not required for these routes inasmuch as the existing descriptions are broad enough to cover the changes involved".

On January 10, 1969, PCBC had amended the Master Plan of Streets to include the routes in system 3–A, with the Rosemont by-pass.[36] PCBC noted that: "The door is now open to a much more fruitful working process than was formerly operative when the Concept Team was confined within the limits of the original condemnation ordinance."

As a method of involving the community in the planning of the proposed portions of the Interstate System in Baltimore City, IDBC had organized the Conceptual Review Committee (CRC) late in 1968. CRC consisted of a permanent committee of representatives of major city agencies, including Recreation and Parks, Planning, Housing and Community Development, Public Works and Education. City-wide private agencies were also represented, such as the Citizens Planning and Housing Association, Greater Baltimore Committee, and MAD, one of the plaintiffs herein. On a segment-by-segment basis, these organizations were supplemented by representatives from other community organizations in the vicinity of the segment. Several meetings of CRC were held on each segment to discuss the needs of the community and the ways in which joint development projects could be planned to meet such needs.

The CRC meetings on the F–M corridor were held on March 18, March 25, and April 1, 1969. Among the topics discussed at those meetings were noise and air pollution impacts in the corridor, the type of housing that should be constructed in the area and interim uses for the corridor. Many of the recommendations resulting from these committee meetings were later implemented.

On May 18, 1969, the Mayor requested RPC to include the 3–A system as the basis for future comprehensive transportation planning for the Baltimore Re-

---

36. The principal differences between 10–D and 3–A as modified are:

Segment 10 has become an Interstate spur, I–170.

Segment 13, the Gwynns Falls corridor, is wholly new, extending I–70N to I–95.

Segment 11a, the City Boulevard from I–170 south and east to Battery Avenue, although not part of the Interstate System, is a Federal-aid primary highway.

Segment 11b, the City Boulevard from I–170 north and east to Mount Royal Avenue is wholly new, and is not part of the Interstate funding program.

Segment 6, I–395, from the Middle Branch of the Patapsco to Henrietta Street has become a spur on the Interstate System.

The crossing of the Inner Harbor by I–95 has been eliminated.

Segment 14, I–95 from Russell Street east to O'Donnell Street, through Locust Point with a crossing of the Harbor at Fort McHenry, is wholly new.

gion. On June 30, the Budget and Program Committee recommended to RPC approval of the Mayor's request.

On July 18, 1969, RPC adopted a resolution which:

Recognized the 3–A alignment as the Interstate configuration within Baltimore City, to supersede the alignment described in the 1967 GDP;

Determined that the 3–A alignment be the basis of subsequent comprehensive planning; and

Approved the 3–A alignment subject to necessary public hearings required for alteration of the GDP.

The RPC resolution contained a whereas clause which recited that 3–A provides: better traffic distribution to the regional core, added economic inducement to underdeveloped industrial areas, needed facilities to accommodate significant travel desires across the northwest branch of the Patapsco River, and the removal of the bulk of the through traffic from the high density core area.

On October 1, 1969, the SHA–UDCA contract was amended to reflect the change from 10–D to 3–A. That contract required UDCA to develop systemwide concepts, including design criteria, and segments concepts, including corridor development planning and engineering concept design. Preliminary engineering has been continued to the present.

As of January 1, 1970—

I–70N was constructed or under construction from Pennsylvania to a terminal point at or near the west City line.

I–95 was constructed or under construction from the Washington Beltway to the southwest city line of Baltimore and from that line to a terminal point at Caton Avenue (segment 7 of 3–A); other parts of I–95 (segments 1 and 2 of 3–A) were constructed or under construction between the east city line in the vicinity of the Harbor Tunnel Thruway and a terminal point near O'Donnell Street.

I–83 was constructed from the Pennsylvania line to the north city line and thence, as JFX, to a terminal point at Eager Street.

As of January 1, 1970, there was no other construction underway on the highways included in 3–A; no other segment of those highways in Baltimore City had received design approval; and 11 of the 16 segments had not received location approval.

The proposed final EIS on F–M was submitted by IDBC to FHWA on December 16, 1971, and was supplemented on September 5, 1972.

The EIS on F–M was prepared by IDBC in cooperation with Joseph A. Stackley, the District Engineer of FHWA responsible for the district in which Baltimore City is located. Stackley has at all times been aware of the proposed content and scope of draft and proposed final EIS's on 3–A sections in the City as they were being prepared. Whenever Stackley has felt that an EIS under preparation should be augmented or changed, he has expressed his views to IDBC and those views have been accommodated.

On June 8, 1972, the Assistant Secretary for Environment and Urban Systems, USDoT, sent to the FHWA a memorandum which stated:

"After a careful review of the available information, we have concluded that TEU's concurrence on the subject document should be deferred until certain issues have been resolved or more fully addressed.

"The final environmental impact statement for this segment appears to contain several deficiencies and omissions. Our specific concerns include * * *."

Then followed a statement of five "specific concerns". These "concerns" were covered in the supplement, dated September 5, 1972, to the Final Environmental Impact Statement. They will be considered in detail in the discussion under the heading "Franklin-Mulberry EIS", below.

The design public hearing on I–170 from Pulaski Street to Pearl Street (the F–M corridor) was held on July 25, 1972, following an informational hearing on July 18, 1972.

Design approval of I–170 from Pulaski Street to Pearl Street was requested on September 5, 1972.

On September 15, 1972, following a meeting between representatives of the Environmental Protection Agency (EPA) and FHWA to consider the scope of EPA's comments on the 3–A system and the implications of those comments, an inter-agency "consensus" was reached between EPA and FHWA, which included items which may be summarized as follows:

1. Construction of the F–M corridor is not viewed as a commitment to the entire 3–A system.

2. Neither PS&E approval nor further right-of-way approval would be granted by FHWA on remaining segments of the 3–A system until a regional

impact consideration statement is prepared and circulated to FHWA, USDoT, EPA and the Bureau of Air Quality Control (BAQC).[37]

No agreement similar to that reflected in the preceding paragraph and n. 37 has been entered into in any other region of FHWA. It is an innovative process, designed to foster cooperation between FHWA, TEU (on behalf of the Secretary, USDoT) and EPA.

On October 31, 1972, the Urban Mass Transportation Adm'n (UMTA), an agency of USDoT, approved the application of Md.DoT for a capital grant in the amount of $22,500,000 for a project in connection with Phase 1, Section A of Rapid Transit. This section runs from the Inner Harbor and the CBC to the City line south of Pikesville through the Druid Hill area and the northwest transportation corridor. The amounts expended or committed in connection with the planning and preliminary engineering of the Rapid Transit system total $4,553,091. Some $22,000,000 in Federal

37. The "Final Form of Consensus Reached at 9/15/72 Meeting Concerning Baltimore 3–A Highway System" states the consensus, as follows:

"1. A large number of EPA's critical comments can be addressed through the preparation of final impact statements on the present segment basis. EPA will receive a copy of these final impact statements.

"2. On the comments of EPA which involves regional impact considerations the following procedure was agreed upon:

"A. The Franklin-Mulberry corridor portion of I–170 will be processed through to the Council on Environmental Quality with the understanding that this project can function as an independent part of the interstate system. Because the construction of this project is not viewed as a commitment to the entire 3–A system, it will not be required to address R.I.C.'s.

"B. For all remaining segments under environmental review, TEU, after satisfying its other criteria, will transmit the final environmental impact statement to the Council on Environmental Quality with the administrative stipulation that neither PS&E approval, nor further ROW approval will be granted until a Regional Impact Consideration Statement (R.I.C.S.) is prepared and circulated to

FHWA, U.S. DOT, EPA and Maryland Bureau of Air Quality.

"This R.I.C.S. will address those Regional issues identified by EPA in its various reviews that cannot be addressed on a project basis and will include, as a minimum,

"1. Cumulative (Regional) air pollution impact of the various stages of completion of the currently envisioned 3–A system (including the MTA system) in the years,

1978
1980
1985
1990

"2. A detailed discussion of possible modifications to the proposed system to mitigate air pollution problems. The effect of these changes on land use and local traffic patterns should be discussed.

"These modifications should include the options of:

"a. Increased highway access to the MTA system.

"b. Impact of elimination of various segments of the 3–A system.

"c. Optimization of scheduling of construction to minimize saturation of local street systems.

"d. Impact of the no-build alternative."

funds and $11,000,000 in State funds are programmed for further work on the Rapid Transit. The updated projected completion costs for Phase I, Rapid Transit, assuming a 1980 completion date, are $976,000,000.

The future of rapid rail transit in the F–M corridor is conjectural. MTA is making no plans for the west leg of the proposed rapid rail transit system, because it has no money to do so. No decision has been made as to which leg of rail rapid transit will be built next after the two legs of Phase I, which run from Owings Mills to the CBD and the Inner Harbor, and thence to south of Glen Burnie, in Anne Arundel County, with a leg to Friendship Airport.

On December 15, 1972 following public hearings, RPC adopted the 1972 GDP, which includes configuration 3–A within Baltimore City.

The Report on the 1972 GDP stated that it "proposes an integrated, balanced transportation system which utilizes the most appropriate travel modes to accomplish a wide variety of transportation needs. The plan was developed by analyzing various transportation systems and recognizing the strong competitive and complementary service aspects of both highways and transit". It states that the need for the improvements proposed in the 1972 GDP for highways, public transportation and other transportation modes was clearly indicated by a region-wide travel simulation analysis conducted during the two years preceding adoption of the plan, and that "in Baltimore City, the critical need is to supplement a basic arterial street system with a freeway network".

The Report noted: "The Port of Baltimore annually contributes over $620,-000,000 to Maryland's economy while directly providing jobs for over 62,000 people. The resulting economic impact is over 1.5 billion dollars or about 12% of Maryland's gross state product. About 55% of the freight moving in and out of general cargo marine terminals moves by truck. During the next five years truck traffic is expected to increase about 75%." The Report concluded: "Unless major highway improvements are made to the existing highway and rail system, the resulting traffic congestion and inefficiency will likely hinder the expected 80% growth in marine cargo tonnage expected during that time frame".

The consensus reached at the September 15, 1972 meeting, confirmed by the "Final Form of Consensus" dated October 13, 1972, constituted approval of the Supplemental Final EIS on "The Franklin-Mulberry Corridor portion of I–170" by TEU on behalf of the Secretary USDoT, as required by DoT's procedure memorandum (DoT 5610.1A ¶ 8 $l$) and by PPM 90–1 ¶ 6 k. The Council on Environmental Quality (CEQ) did not disapprove or otherwise comment on the Supplemental Final EIS, within 30 days after its receipt thereof.

Design approval for I–170 from Pulaski Street to Pearl Street (the F–M corridor) was granted by the Division Engineer of FHWA, by letter to SHA, dated February 12, 1973, which stated:

"The 30 day waiting period for CEQ to act on the final environmental statement expired February 10, 1973.

"Design approval for the subject project is hereby given. [The subject project was I–170–8 (3), Pulaski Street to Pearl Street.]

"It is noted, however, that Fremont to Pearl at this time is not eligible for Interstate financing."

Plans, specifications and estimates were approved for the first construction contract for the F–M corridor by the Division Engineer of FHWA on February 21, 1973. This contract covers roadway grading, construction of retaining walls and bridge abutments in an area of less than three blocks from Pulaski Street on the west to a point west of Fulton Avenue on the east. That contract has been awarded. Construction is scheduled to start before the end of this month (June 1973). If it does not start before June 30, 1973, the City will be obligated to re-

fund to the United States more than $5,000,000 received by it for land acquisition, etc.

The corridor has been divided into four work areas, so that more contractors can bid and local firms can be in a competitive position. The construction contract documents (including construction drawings) for the remaining contracts on the portion of the corridor which has been approved were approximately 25% complete on the first of May, 1973; construction contract documents on the bridges for the corridor were 50% complete.

On April 9, 1973, SHA entered into a consulting contract with Voorhees.[38]

The purposes of the Voorhees contract were: to satisfy the agreement among FHWA, TEU (on behalf of the Secretary USDoT) and EPA, and to supply general information of a regional nature to EPA. While much of this work has been previously done, the Voorhees study will pull the information together in a single document and give EPA immediate access to the information.[39] The Voorhees contract deals with eight alternative transportation networks.[40]

Under task 2 of the contract, Voorhees is to develop socio-economic and land-use data for the target years and adjust the date to reflect the accessibility patterns resulting from the 3–A null alternatives. Task 4 requires the simulation of travel under five alternatives. Task 5 involves quantifying background pollution levels for carbon monoxide, hydrocarbons, nitrogen-oxide, photochemical oxidants, and particulates on a regional basis as input to task 6. Task 6 requires that the vehicle trip ends, vehicle miles traveled and speed estimates developed for each of the eight alternatives be run on BAQC emissions model to obtain the level of mobil source emissions for carbon monoxide ($CO$), hydrocarbons and nitrogen-oxide. This will then be aggregated with the background emissions data and assimilated with necessary meteorological and air quality data in order to run dispersion models for each alternative. An existing model is to be used for CO, a rollback technique is to be used for oxidants, and the "best available methodology" for nitrogen-oxide and particulates. Task 7 involves predicting sewerage and storm water run-off resulting from the land-use patterns which are projected as a consequence of each transportation system alternative. Task 8 requires predicting regional consequences relative to solid waste, in connection with the land development patterns resulting from the transportation alternatives. Task 9 involves an overview and analysis of the impact of community noise levels from the various alternative transportation systems involved.

### Discussion

#### I

The plaintiffs have argued vigorously that the "3–A system" as a whole must be the subject of an EIS. The point of departure in this inquiry is the requirement of NEPA, 42 U.S.C. § 4332(2)(C), that an EIS be prepared in the case of

---

38. The cost of the work to be performed under the Voorhees contract is estimated to be approximately $500,000, 90% of which will be funded by the FHWA.

39. The study has developed into a future planning tool for RPC and Md. DoT. Many state agencies such as State Planning, State Health, City Planning and City Health, in addition to RPC and Md. DoT will have a use for the study when completed. It will be a data base and data resource document that can be used for possibly setting future transportation policies and other policies within the Baltimore Metropolitan region.

40. 1. 1970–existing highways and no rapid; 2. 1978–existing and programmed highways and phase 1 rapid; 3. 1980–programmed highways and phase 1 rapid; 4. 1980–partial network of highways and phase 1 rapid; 5. 1980–programmed highways, without 3–A, and phase 1 rapid; 6. 1995–all highways and rapid in GDP; 7. 1995–all highways, except 3–A, and all rapid in GDP; 8. 1995–only presently existing highways and all proposed 3–A, and all rapid in GDP.

" * * * major Federal actions significantly affecting the quality of the human environment * * *."

Plaintiffs contend that the "Bridwell letter" dated January 17, 1969,[41] was a federal approval of the "3-A system" as a "program for projects" under 23 U.S.C. § 105, and, as such, was a "major federal action" within the meaning of NEPA. This argument misconstrues the nature of a "program for projects".[42]

■■■ A "program for projects" under § 105 is neither an integrated unit nor a group of well-defined, specifically located, and previously engineered highways. Under PPM 21-1(5) (Feb. 2, 1962), each project in a program must be submitted on a separate FHWA form. Since § 105(a) authorizes approval of a program "in whole or in part", failure to approve one of the projects submitted for program approval does not affect the status of a program or other projects in it. Projects relating to a particular proposed highway may be submitted for approval in a program at one time or over the course of several years. With respect to each project, a "program for projects" usually presents for approval one or more stages or part of the work necessary ultimately to be completed to result in the actual finished construction of a highway.[43] This approval, known as "program approval", is required before a state may undertake work, even with its own funds, on any project for which it ultimately may receive federal reimbursement. PPM 21-1.

■■ Program approval under § 105 does not commit the federal government to provide federal funds for use in highway construction, but results merely in a reservation of previously apportioned federal funds for potential use.[44] It is only after approval of plans, specifications, and estimates (PS&E approval) under 23 U.S.C. § 106(a) that the federal government is contractually obligated to pay its share of a project's costs. See 23 U.S.C. §§ 110 and 121. The Bridwell letter, not having been the result of a request for "program approval" as contemplated in 23 U.S.C. § 105 or PPM 21-1, and not fitting the administrative mold of program approval under § 105 and the applicable PPMs, was not major federal action taken under 23 U.S.C. § 105.[45]

■ The Bridwell letter was not intended to and did not constitute the "3-A system" a legal entity with independent legal status under the Federal-Aid Highway Act. The letter merely referred to "Scheme 3A" as a convenient means of describing the conceptual configuration of Interstate routes 70N, 83, and 95, as they appeared on the drawing of the so-called 3-A system which had then been recently endorsed by Mayor D'Alesandro and the Policy Advisory Board of IDBC. This configuration rep-

---

41. Letter from Lowell K. Bridwell, Federal Highway Administrator, to Jerome B. Wolf, then Chairman-Director of the Maryland State Roads Commission.

42. Section 105(a) requires the states "[a]s soon as practical after the apportionments for the Federal-aid systems have been made for any fiscal year," to submit to the Secretary of Transportation "for his approval a program or programs of proposed projects for the utilization of the funds apportioned." Program approval is necessary to enable a state ultimately to obtain reimbursement for part of the cost of the project. A state may not be reimbursed for the cost of any work begun on a project before program approval is obtained.

43. For example, preliminary engineering, right-of-way acquisition, preparation of final construction drawings, and actual construction for a portion of a federal-aid highway may each be submitted separately and at different times for approval by FHWA under § 105.

44. For a discussion, see "The Federal-Aid Highway Program; Administrative Procedures and Judicial Interpretation", Peterson and Kennan, 2 ELR 50001–50008.

45. It is therefore not necessary to decide whether "*major* federal action" can ever take place at the § 105 program approval stage in the development of a Federal-aid highway.

resented a minor revision in the previously authorized conceptual configurations of I–70N, I–83 and I–95, which did not require any change in their general route descriptions. The letter also approved, without specific reference to "Scheme 3A", the addition of I–170 and I–395 to the Interstate System, and conceptually described those routes.

It must not be forgotten that the Federal-Aid Highway Act contemplates cooperative interaction between state and local officials and the FHWA. Roads which are partially financed under the Federal-Aid Highway Act are proposed, planned, and constructed by state and local governments. The Act provides that the routes of the Interstate System " * * * to the greatest extent possible, shall be selected by joint action of the State Highway Departments of each state and the adjoining states, subject to the approval by the Secretary [of Transportation] as provided in * * * this section." 23 U.S.C. § 103(e)(1). See also PPM 10–1, ¶ 7(a). The Bridwell letter was simply an approval of part of a requested modification of the Interstate System by SHA. It allowed the SHA to take advantage of additional mileage authorized for the Interstate System by Congress in 1968. Pub.L. 90–495, § 14(b), 82 Stat. 822, 826.

 The Bridwell letter was federal approval of a systems modification authorized by 23 U.S.C. § 103(e). Such approval does not impose any obligation on the federal government. Further approvals are necessary before any federal money can be used on any project. Section 103(e) approval, insofar as a proposed Interstate Highway is concerned, is merely an indication by the federal government that a state's very general proposal for the route of a highway to be constructed with 90% of the cost to be borne by the federal government is compatible with the federal government's plan for an interstate system of highways. As set forth in PPM 10–1, ¶ 3(a):

"The National System of Interstate and Defense Highways consists of routes of highest importance to the Nation, which connect the principal metropolitan areas, cities and industrial centers, including important routes into, through and around urban areas, serve the national defense, and to the greatest extent possible, connect at suitable border points with routes of continental importance in the Dominion of Canada and the Republic of Mexico."

Under paras. 7(d), 8(a), and 9(b) of PPM 10–1, interstate route descriptions are general point-to-point descriptions. Route selection and approval are merely the first preliminary steps in a long process which eventually obligates the federal government to fund construction of a highway. 23 U.S.C. § 103(e); Arlington Coalition v. Volpe, 458 F.2d 1323, 1328 (4 Cir. 1972).

 Nothing in the Bridwell letter or in any of the applicable federal statutes or regulations requires that the 3–A system must be funded as a unit, viewed as a unit, or approved as a unit. The so-called 3–A system includes a proposed primary highway, as well as Interstate Highways. The Bridwell letter does not require nor indeed contemplate that the whole "3–A system" be finally approved and constructed if any part of the 3–A system is approved and constructed. Section 103 should not be construed as requiring a new systems approval of the entire 3–A configuration every time any modification is made in any route forming a part thereof, whether or not such route is a part of the Interstate System, although the change in the particular route might have to be approved under § 103, and the addition of further Interstate routes would require § 103 approval.

 As another part of this opinion will indicate, it is appropriate for some purposes to place each highway in the context of the total transportation function which it is to achieve, an examination which requires a broad look at the entire Interstate System in the area, as well as other highways, but this does

not mean that any such system itself is the unit of approval. In short, the statutory scheme of the Federal-Aid Highway Act, and the administrative policies adopted thereunder, contemplate each individual Federal-aid highway as the unit of federal consideration and action and not the network of highways which ultimately will result from the approval and construction of the respective units. Neither the Bridwell letter nor any other action of the FHWA has constituted the 3–A system as a unit with legal status or stature.

Even though the 3–A system does not have a definite legal status within the statutory or regulatory framework of FHWA, plaintiffs contend that nevertheless the broad mandate of NEPA attaches to the 3–A system as a whole. They argue that only if the entire proposed highway system is considered in an EIS can an informed judgment be made, giving due weight to the broad environmental and other factors involved.

There is merit to the proposition that the units for consideration for decision making purposes cannot be so fragmented as to minimize artificially the potential adverse environmental impact of an implemented decision. That is not to say, however that NEPA itself requires an expansion of the unit of decision by a federal agency.

Under NEPA, each agency of the Federal government is required to—

"§ 4332

(2)

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decision making along with economic and technical considerations."

Furthermore, NEPA provides that—

"§ 4333

All agencies of the Federal Government shall review their present statutory authority, administrative regulations, and current policies and procedures for the purpose of determining whether there are any deficiencies or inconsistencies therein which prohibit full compliance with the purposes and provisions of * * * [NEPA] and shall propose * * * such measures as may be necessary to bring their authority and policies into conformity with the intent, purposes, and procedures set forth in this chapter."

Pursuant to its responsibilities under NEPA and in specific response to the directives of Executive Order 11514 (March 4, 1970),[46] the CEQ published guidelines for Federal agencies in the preparation of environmental impact statements required by § 102(2)(C) of NEPA.[47] These guidelines, consistent with §§ 4332(2)(B) and 4333, placed the primary responsibility upon each individual Federal agency to prepare its own NEPA procedures.[48]

Policy and Procedure Memorandum 90–1 (PPM 90–1)[49] is the response of FHWA to the mandates of NEPA, Executive Order 11514, and the CEQ Guidelines, that FHWA produce its own procedures for the preparation of § 102(2)(C) statements.[50] PPM 90–1, ¶ 3a defines a "highway section" as "a substantial length of highway between logical termini"; ¶ 5 makes a "highway section" the unit for which an EIS must be prepared; and ¶ 6 provides that a "highway section included in an environmental statement should be as long as practicable to permit consideration of environmental matters on a broad scope * * * [and] should be of substantial

---

46. 35 Fed.Reg. 4247.

47. 42 U.S.C. § 4332(2)(C).

48. CEQ Guidelines, ¶ 3(a), 36 Fed.Reg. 4724 (1971).

49. 37 Fed.Reg. 21809 (1972).

50. PPM 90–1 also deals with FHWA procedures for implementing 49 U.S.C. § 1653(f), 16 U.S.C. § 470f, and 42 U.S.C. § 1857h—7.

length that would normally be included in a multi-year highway improvement program".

▮ FHWA has consistently interpreted "highway section", as used in PPM 90–1, to mean a road or a portion of a road, rather than a network of roads. No regional or system-wide EIS has been prepared under PPM 90–1 in any part of the country. The FHWA's interpretation of its own PPM with respect to the meaning of "highway section" is entitled to great deference by the court. Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1964).

It is not surprising that the primary responsibility for preparing procedures to comply with NEPA was placed in the particular Federal agency affected by its requirements. As the CEQ Guidelines, ¶ 1, states in part:

"The objective of section 102(2)(C) of the Act and of these guidelines is to build into the agency decision making process an appropriate and careful consideration of the environmental aspects of proposed action and to assist agencies in implementing not only the letter, but the spirit, of the Act."

Since the key factor in each case is the nature of the decision making process of the respective agency, each agency is to produce its own procedures which will build into its own decision making process an appropriate consideration and evaluation of the environmental aspects of its own proposed actions. This policy is simply a recognition that the decision making process changes from agency to agency. Cf. City of Boston v. Volpe, 464 F.2d 254, 258–259 (1 Cir. 1972).

▮ Whatever the laudable purpose of NEPA, its method of achieving that purpose was to require that the decisions of responsible federal officials be made after an appropriate and careful consideration of the environmental aspects of the proposed actions. City of Boston v. Volpe, supra. Despite the breadth of the NEPA, its application is only to the decision making processes of the Federal government, Civic Improve-

ment Committee v. Volpe, 459 F.2d 957 (4 Cir. 1972). Similarly, it does not change the scope of the decisions which are to be made by the responsible Federal government officials but only the factors which must be considered in making the decisions which other statutes and regulations require them to make. Cf. City of Boston v. Volpe, supra, 464 F.2d at 258–259. As has been pointed out, the Federal-Aid Highway Act and the administrative practice of FHWA contemplate a road as a basic unit of decision making rather than a network of roads. There was, therefore, no "major federal action" which treated the 3–A system as a unit and, therefore, under the plain language of the NEPA no EIS is required for the "3–A System" as a whole.

No case has been cited or found in which NEPA has been seen as requiring an elevation of the basic unit of decision making by the responsible Federal government officials under the Federal-Aid Highway Act from a road or highway to a network of roads or highways.

In James River and Kanawha Canal Parks, Inc. v. Metropolitan Authority, 359 F.Supp. 611 (E.D.Va.1973), the Downtown Expressway in Richmond, a highway programmed for exclusive state funding, was held not to be subject to NEPA, even though it had been planned as unified and interdependent with I–195, a Richmond Interstate spur, and even though federal funds had at least partially paid for the studies which resulted in the planned network of express highways of which the Downtown Expressway was one. No suggestion was made in that case that the network of highways comprising the proposed Richmond expressway system, was required under NEPA to be the subject of an EIS, even though its planning was at least partially financed by federal funds and even though at least one of the component roads of the network was a planned interstate highway.

In Citizens for Mass. Transit Against Freeways v. Brinegar, 357 F.Supp. 1269 (D.Ariz., 1973), the court rejected the

plaintiffs' contention that the segments into which a 60 mile long portion of I–10, an Interstate Highway, together with a proposed intersecting Federal-aid primary highway, were broken for purposes of preparation of present and future EISs and for other purposes, amounted to "piecemealing". The court stated, 357 F.Supp. 1269 at 1284:

"Taken to extremes the logic of what plaintiffs assert would be to require approval of an entire freeway system before any action could be begun. This simply is not required by the statute."

In Northside Tenants' Rights Coalition v. Volpe, 346 F.Supp. 244 (E.D. Wis.1972), the court held that an EIS was required for Park Freeway-West, a four mile long federal-aid primary highway forming a portion of the expressway system of Milwaukee County. The expressway system of Milwaukee involves approximately 60 miles of highway, of which 21 miles were uncompleted at the time of the decision.

Similarly, Morningside-Lenox Park Association v. Volpe, 334 F.Supp. 132 (N.D.Ga.1971), arose against the background of a system of urban expressways in Atlanta. The case deals only with a requirement of an EIS for a four mile segment of I–485 and does not suggest that an EIS for a network of expressways was required by NEPA.

In Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323 (4 Cir. 1972), cert. den. 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972), which dealt with a portion of the total proposed freeway system in the Washington-Metropolitan area as well as in northern Virginia, the Fourth Circuit did not suggest that a regional or system-wide EIS was required. The discussion was in terms solely of an EIS on that portion of proposed I–66 located in Arlington County. The opinion in *Arlington* was modified on a petition for rehearing to delete the Fourth Circuit's previously imposed requirement that decisions required to be made by responsible federal officials in reference to I–66 be

subsequent to the resolution of problems which had been raised in reference to a proposed intersecting Interstate highway, I–266, and the connecting "Three Sisters Bridge" across the Potomac. The deletion of this requirement occurred even though the modifying opinion recognized that the Three Sisters Bridge I–66, and I–266 were " * * * all three interrelated projects". 458 F. 2d at 1339. While not precluding simultaneous consideration of the three projects and their probable impact on each other, *Arlington,* as modified, did not require that those three projects in or adjacent to northern Virginia be the subject of a single EIS nor that there be an EIS for the regional highway network.

In some situations the relationship of several roads or parts of road may be so interrelated that no one road or part of a road can function as an efficient carrier of motor vehicles except in conjunction with the others. In such a case, it is possible that it would be necessary to have an EIS which would have as its subject all of the roads or parts of roads which could only function efficiently as a unit. In such an unusual situation, the several roads would not constitute a system of highways but would be treated essentially as a single highway for the purpose of the EIS.

In the instant case, however, the court has found that the roads included in the 3–A system are not essentially a single highway. While they were planned together and complement each other, each interstate and primary route in the system is proposed to serve a different function in the movement of interstate and local vehicular traffic. The court cannot say that it was irrational, arbitrary, or capricious for the Federal agencies to conclude, after examination of all the facts, that deletion of one or more of the routes in the 3–A system would not necessarily so reduce the utility as vehicular traffic conveyors of the remaining routes as to require an EIS for the system as a whole. This court finds that the components of the 3–A system are not necessarily so inter-

dependent as to require the construction of all of the 3–A system or none of it.

▮▮▮▮ Although we have concluded that an EIS on the 3–A system as a whole is not required, and that an EIS may be prepared for a particular section of a highway under PPM 90–1, it will not be sufficient in the future to consider the environmental impact of certain segments or sections of such highways as I–95, I–70N and I–83 entirely apart from other segments of those roads or from the entire configuration known as the 3–A system.[51]

In making some of the decisions which amount to major federal action with respect to one or more of the roads or segments thereof in the 3–A system, the Secretary, USDoT, or his delegate, may have to consider with respect to some of the environmental impact problems, not only the environmental impact of the road or segment for which his immediate approval is requested, but also the total environmental impact which would result from the use of the road or segment under consideration if and when used in connection with other segments or roads, already built or proposed to be built.

It may be wise for the City, State and Federal authorities to prepare in the near future a statement which considers those environmental impacts which should be determined with respect to the entire configuration, or major portions thereof. Such a statement would be included in one or more of the EISs which will have to be prepared in the future for other sections of the highways in the 3–A system, and which will, of course, also include and consider those environmental impacts which should properly be determined section by section or road by road.

## II

A draft EIS on the F–M corridor, covering an area designated as "Inter-

state Route I–170 from Pulaski Street to Pine Street in the City of Baltimore", was forwarded on or about August 23, 1971, to the various state and local agencies to which a draft EIS is to be sent under 42 U.S.C. § 4332(2)(C), the CEQ Guidelines, ¶ 10, and PPM 90–1, ¶ 6, and Appendix G. Five Federal departments or agencies and two Maryland departments or agencies responded to the draft EIS. An effort was made by IDBC, in consultation with FHWA officials to incorporate into a proposed final EIS on the F–M corridor materials in response to the Federal and State agency comments. A proposed final EIS on the F–M corridor was filed with FHWA on December 15, 1971, and was reviewed and accepted for content by the Regional Highway Administrator on April 21, 1972, in accordance with PPM 90–1, ¶ 6j.

In accord with the USDoT's procedure memorandum (DOT 5610.1A ¶ 8l)[52] and PPM 90–1, ¶ 6K, the proposed final EIS was submitted to USDoT's offices of Environment and Urban Assistance (TEU) for review and concurrence on behalf of the Secretary. On June 8, 1972, TEU by letter advised the Federal Highway Administrator that TEU's concurrence on the F–M corridor EIS was being deferred " * * * until certain issues have been resolved or more fully addressed". · In summary, TEU expressed the view that the EIS should more fully discuss (1) the various joint development proposals planned for the F–M corridor, (2) the possible noise and air pollution effects of the construction of I–170 in the F–M corridor, (3) the detailed proposals for actual construction, with maps and other graphic material, (4) the propriety of the construction of the entire I–170 spur before a resolution of the issue of whether or not I–70N would be constructed through Leakin and Gwynns Falls Parks to connect with I–170, and (5) the means by

---

51. There has been a tendency, if not a custom, for highway agencies to emphasize the desirable features of the entire length of a highway if and when completed, but to limit the consideration of any unfavorable environmental effects to the immediate area of the segment.

52. 3 E.L.R. 46089, 46091.

which citizen-participation had been and would in the future be a part of the planning and implementation process for the construction of I–170 in the F–M corridor.

By letter dated September 1, 1972, to FHWA, after consultation with Joseph A. Stackley and other officials of FHWA, SHA responded to TEU's comments of June 8, 1972. The SHA letter stated in pertinent part:

In response to TEU Comment No. 1:

"A section on joint development is being added to the final statement. This section will include an up to date status report on the urban design concept associates proposals. It will outline those proposals that have been rejected or modified and the reasons for the rejection or modification. It will include those new proposals promulgated by the Interstate Division's joint development team. All proposals will be evaluated for potential funding and possibility for implementation."

In response to TEU Comment No. 2:

"As a response to the lack of data on noise, we have added major portions of Bolt, Beranek, and Newman's Acoustic Analysis to the Final Statement. The report is quite specific in pointing out future noise levels at housing sites, school sites, and existing residential sites. We have added a summary of noise impact including sketches of recommended acoustical barriers and their potential for being implemented. Estimates of future air pollution characteristics, ambient air quality, and other data requested by the Environmental Protection Agency has been included in the Final Statement. A short summary of consultations with State Air Quality agencies has also been added."

In response to TEU Comment No. 3:

"Additional maps, photographs, graphics have been added to the Final Statement to further elaborate on the existing conditions and the future impact of the project."

In response to TEU Comment No. 4:

"The City of Baltimore feels strongly that the Franklin-Mulberry project should not be delayed because of the Leakin Park issues. The Franklin-Mulberry Expressway is a vital part of the city's future transportation plans. The entire corridor of some 15 to 20 blocks is vacant as indicated in the photos attached in the supplement. The city has displaced almost 1,000 residents for this corridor. Since 1966 the area has been a virtual wasteland.

"It would indeed seem inappropriate if action on this project did not proceed. The city is committed to construction of the 3A System of which Franklin-Mulberry is a basic part. To leave this area fallow and to allow continued deterioration of this community any longer than absolutely necessary would be unthinkable.

" * * *

"Should the city select any other route alternative [for 70N], it could easily tie into the present I–170. Even if the city decided, as a result of the I–70N hearing, not to construct I–70N from the west city line to I–170, the Franklin-Mulberry Expressway would still be a valuable part of the city's transportation network. Although it would have dubious interstate characteristics in this instance, the city would be desirous of the construction of I–170. Only its funding source would change in this instance.

"The City of Baltimore feels that Franklin-Mulberry is a needed facility and should proceed to construction regardless of the Leakin Park controversy. Franklin-Mulberry highway construction will be more time consuming and tedious than adjacent sections. It therefore should begin as soon as possible so as not to delay the ultimate use of an I–70N/I–170 Corridor."

In response to TEU Comment No. 5:

"A design public hearing concerning the Franklin-Mulberry Corridor and

its joint development proposals was held on July 25, 1972. This was the latest in a series of public involvements spanning the last five years. A summary of public involvement including public hearing reactions has been added to the Final Statement. Included in this summary are the future steps where citizen involvement will occur."

The final EIS, as originally submitted on December 15, 1971, was supplemented on September 5, 1972, by a document containing approximately 348 pages, exclusive of the pages on which the aforesaid letters appeared. The supplemental EIS material contained approximately 67 pages relating to the current status of joint development proposals and discussion of alternative design concepts for I–170 in the F–M corridor. Approximately 222 pages of the supplemental EIS were devoted to summaries of analyses of noise impacts at various locations adjacent to and within the F–M corridor which could be expected as a result of the construction and operation of I–170 therein, recommendations of acoustical consultants of means to minimize or avoid excessive acoustical impact including a recommendation that consideration be given to condemning additional dwellings on Mulberry Street near Ramps J and K, and various supporting data, calculations, and plans. Approximately 10 pages included in the supplement EIS were devoted to calculations, investigations, and conclusions relating to the impact of the construction of I–170 upon air quality. Approximately 24 pages of the supplemental EIS contained photographs and graphics of the F–M corridor as it was, as it is now, and as it is proposed to be with the ultimate implementation of the joint development proposals, the construction of I–170 and rapid rail transit in the F–M corridor. Approximately 24 pages outlined, illustrated, and summarized citizen participation in past planning of I–170 in the F–M corridor and proposed future citizen participation. The last page listed certain

amendments, additions, and deletions to the text of the original final EIS.

As stated more fully in the chronological Statement of Facts, TEU approved the Supplemental Final EIS as part of the consensus reached among FHWA, EPA and TEU, and CEQ did not disapprove it within 30 days of the receipt thereof by CEQ. See CEQ Guidelines, ¶ 10(b).

Two major questions must be considered: (1) whether the responsible Federal officials followed the procedural requirements of NEPA and the applicable regulations in the preparation and content of the EIS; and (2) whether the substantive decision of the Secretary or his delegate in approving the EIS, and in granting PS&E and other approval was a clear error of judgment, or arbitrary or capricious, or failed to consider the relevant factors. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415 et seq., 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Conservation Council of North Carolina v. Froehlke, 473 F.2d 664 (4 Cir. 1973); Appalachian Power Company, et al. v. Environmental Protection Agency, 477 F.2d 495 (4 Cir., 1973); Ely v. Velde, 451 F.2d 1130 (4 Cir. 1971); Environmental Defense Fund v. Corps of Engineers, U. S. Army, 470 F.2d 289 (8 Cir. 1972), cert. den., 412 U.S. 931, 93 S.Ct. 2749, 37 L. Ed.2d 160 (1973).

NEPA has two levels of application. The CEQ Guidelines, ¶ 11, provides:

"To the maximum extent practicable the § 102(2)(C) procedure should be applied to further major Federal actions having a significant effect on the environment even though they arise from projects or programs initiated prior to enactment of Public Law 91–190 on January 1, 1970. Where it is not practicable to reassess the basic course of action, it is still important that further increment on Federal actions be shaped so as to mimimize adverse environmental consequences. It

is also important in further action that account be taken of environmental consequence not fully evaluated at the outset of the project or program." Under the CEQ Guidelines, therefore, the application of NEPA is more rigorous when it is applied in the early stages of a project involving major Federal action than when it can be applied only in the later stages of an ongoing project.[53] This administrative interpretation of the Act by the enforcing agency is entitled to great deference. Griggs v. Duke Power Co., 401 U.S. 424, 91 S. Ct. 849, 28 L.Ed.2d 158 (1971).

■ Under NEPA, an EIS required for an ongoing project may not need to be as broad in scope under all the circumstances pertaining to that project at the time of NEPA's application as would be the case if the project had not been initiated prior to January 1, 1970. Just as a balancing of factors test governs a determination of whether or not NEPA applies at all to an ongoing project, Arlington Coalition v. Volpe, 458 F. 2d 1323 (4 Cir. 1972), so a balancing of factors test is also applied in determining the degree of application of NEPA to an ongoing project.

Each of the five points which 42 U.S. C. § 4332(2)(C) requires to be discussed in an EIS were at least minimally referred to in the EIS for the F-M corridor.

■ The plaintiffs complain that the alternatives of supplanting the proposed 1½ mile segment of I-170 with rapid rail transit or bus transit were not considered in the EIS. Although the EIS makes it clear that I-170 in the F-M corridor will be constructed in such a way as to reserve land for the later construction of a rapid rail transit line and although the EIS also indicates that provision will be made for bus transit in the F-M corridor, it is true that no specific part of the EIS treats rapid rail or bus transit as an alternative to construc-

tion of I-170 in the F-M corridor. NEPA, however, does not expand the alternatives which must be discussed in an EIS beyond those "realistic alternatives that will be reasonably available within the time the 'decision making'[54] official intends to act". Partially concurring and partially dissenting opinion of Judge MacKinnon, Natural Resources Defense Council, Inc. v. Morton, 148 U. S.App.D.C. 5, 458 F.2d 827 (1972), at 840. Environmental Defense Fund v. Corps of Engineers, U. S. Army, 470 F.2d 289, 297 (8 Cir. 1972), cert. den., 1973, 412 U.S. 931, 93 S.Ct. 2749, 37 L. Ed.2d 160. Here, it is not certain even today when the west leg of the proposed rapid rail transit system in the Franklin-Mulberry corridor will be built. No preliminary plans have been or are being made for the west leg because MTA has no money to do so. No decision has been made as to which leg of the rapid rail transit system will be built next after the first two legs, one to the northwest and one to the southwest, collectively known as stage one.

No traffic or engineering experts testified before the court that rapid rail transit alone in the F-M corridor would eliminate any need for a road designed to the standards of I-170 in the F-M corridor from Pulaski Street to Pine Street. Similarly no expert evidence was introduced before the court that a combination of rapid rail transit and increased bus transit would eliminate any need for a road to the standards of I-170 in the F-M corridor. On the other hand, there was substantial evidence, which this court accepts, that the traffic studies conducted by J. E. Greiner of Expressway Consultants in the early 1960s, by Wilbur Smith & Associates for the BMATS Study of 1964, by A. M. Voorhees, in connection with the modal split for the DMJM Study in 1967-68, and by UDCA all demonstrated a need for an expressway in the F-M corridor. BMATS, DMJM, and UDCA all consid-

---

53. I. e., a project which began before January 1, 1970, and was continuing thereafter.

54. 42 U.S.C. § 4332(2)(A).

ered rapid rail transit and bus transit and concluded that expressways, rapid rail transit, and bus transit were all needed in Baltimore. The same conclusion was reached by Parsons, Brinkerhoff, Quade and Douglas in that consulting engineering firm's report to MTA in 1964.

Under the circumstances here, it was not necessary for the EIS to restate the conclusions of all the experts, or to engage in, for the purposes of this one project, a rethinking of the regional and city-wide transportation plans. There is no evidence here that rapid rail transit alone in the F–M corridor is a reasonable alternative to construction of I–170 in the F–M corridor; and this court, having made a substantial inquiry, cannot find that it was error for the appropriate Federal officials to have concluded that NEPA did not require the EIS to discuss in detail, the substitution of rapid rail transit as an alternative to the proposed expressway in the F–M corridor.

Administratively, none of the Federal or State agencies which reviewed either the draft EIS, the final EIS of December, 1971, or the supplemented final EIS of September, 1972, suggested that a reasonable alternative to the construction of I–170 in the F–M corridor was solely rapid transit or increased bus transit. While not determinative, this is a factor which the court has properly considered in its substantial inquiry.

Moreover, the EIS did consider the "no build" alternative. Although the discussion of the "no build" alternative might not have been sufficient if this project were being reviewed in different circumstances, we conclude that the application of NEPA to this project, balancing all the factors, is not so rigorous as to require this court to invalidate the EIS.

In Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323 (4 Cir. 1972), the Fourth Circuit announced the test of applicability of NEPA to ongoing projects to be a balancing of the costs of altering or abandoning the proposed route against whatever benefits might accrue from compliance with NEPA. Any doubt that "the costs of altering or abandoning the route would not certainly outweigh the benefits" is to be resolved in favor of applicability of NEPA. *Arlington Coalition*, supra, at 1335. In *Arlington Coalition*, however, the Fourth Circuit did not elucidate the factors which should be considered "costs" and "benefits" for use in the test, preferring apparently to allow the decisions to be made on a case-by-case basis, each judged by the weighing of all of the pertinent factors. Bearing in mind, as previously noted, that NEPA operates on two levels, flesh must be put on the bones of the balancing test established by *Arlington Coalition* to determine whether the EIS in this case might be invalid for a possibly incomplete statement of alternatives.

One of the factors on the "cost" side of the ledger is the stage of development of the project in question at the time a Federal agency is required to apply NEPA in making a decision.

Another factor is the extent to which the responsible officials, State and Federal in the case of a Federal-aid highway, have attempted to take environmental concerns into account in regard to a particular project. Environmental Law Fund v. Volpe, 340 F.Supp. 1328 (N.D.Cal.1972).

A third factor is the extent of the good faith objectivity which the responsible Federal officials have exercised, if at all, in determining the applicability of the alleged NEPA requirement to the project. Cf. Environmental Defense Fund v. Corps of Engineers, U. S. Army, 470 F.2d 289, 296 (8 Cir. 1972), cert. den. 1973, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160. Subjective impartiality is not required. Id.

A fourth factor in a Federal-aid highway case is the cost to the State or local government of halting construction or

other work on a project, or of otherwise fulfilling the requirement which allegedly is imposed by NEPA. *Arlington Coalition,* supra, 458 F.2d at 1333.

Another factor in the balancing test is the degree of participation of the residents of the affected community in the decision making process. Environmental, social and economic considerations are particularly fruitful subjects for community thought and debate. Environmental Law Fund v. Volpe, supra, 340 F.Supp. at 1334.

Finally, the benefit side of the ledger is measured by the likely harm to the environment if the project is constructed as planned or if the alleged requirement of NEPA is not made applicable to it.

Franklin and Mulberry Streets are the northern and southern boundaries respectively of the F–M corridor. Franklin Street is one-way carrying westbound traffic and Mulberry Street is one-way carrying eastbound traffic. These two streets, acting together, perform the traffic function of a major arterial highway with three lanes in each direction. The 1969 traffic counts showed an ADT of approximately 18,000 vehicles on Franklin and Mulberry Streets in the F–M corridor in each direction. Traffic lights and stop signs on the cross streets on each block in the F–M corridor cause frequent starts and stops of vehicles on Franklin and Mulberry Streets, slow the average speed of such vehicles, and reduce the capacity for carrying traffic on Franklin and Mulberry Streets. Franklin and Mulberry Streets at the present time have little or no utility as local streets in view of their function as the major western arterial highway of Baltimore City.

An expressway in the F–M corridor was first proposed in 1942 and has been shown on various proposals and plans since that time. In 1962 a location hearing was held for an expressway in the F–M corridor, proposed at that time for eight lanes, and location approval was granted in 1965. Before IDBC started in 1966 to acquire land in F–M for the expressway, there were a total of 609 properties, mostly residential, in the corridor. As of January, 1969, 88.5% of all the properties had been acquired by IDBC and were almost all either demolished or under contract to be demolished shortly. At the time of the trial in this case, all of the properties in the F–M corridor have been acquired by IDBC except for School No. 176. Aside from the school, the only buildings left standing in the corridor are three houses on Carrolton Avenue being used as HCD offices and one commercial property located at 802 West Mulberry Street. The F–M corridor today in many ways can be likened to an inefficient expressway with a block-wide median strip.

In a real sense, then, the construction of I–170 in the F–M corridor, although included in the Interstate System of highways, can also be looked upon as an improvement and reconstruction of an existing highway which carries interstate and *commuter* traffic via U.S. Route 40. EPA and TEU so viewed it when they agreed with FHWA that the EIS could be processed through CEQ, and that PS&E approval and actual construction of that portion of I–170 would not be viewed as a commitment to the construction of the entire 3–A system.

Based upon the acoustical experts' reports and recommendations in the supplemented final EIS, we find that, if the recommended acoustical barriers are utilized, the sound levels at the windows of the existing residences will remain at about their present levels, except in the area of the ramps to proposed I–170 where the consultant has recommended additional condemnation of existing residences. In some instances the joint development areas within the F–M corridor will have average noise levels slightly in excess of those of 52 dBA now predominating at the existing residences along Franklin and Mulberry Streets. The consultant points out, how-

ever, that generally the "noise pollution level" is decreased because the traffic noise from I–170 will be relatively steady traffic noise rather than the intermittent noise now caused by traffic starting and stopping at the cross streets.

The state of the art in the prediction of concentrations of carbon monoxide (CO) is now at the theoretical stage. There seems to be general acceptance of the "Gaussian plume" theory and the theoretical formula developed by the General Electric Study of September, 1971. There are, however, many variations of the formula and no satisfactory evidence was presented to the court that any of them have been empirically validated. The court finds that the air quality calculations contained in the supplemented final EIS were a reasonably sufficient attempt to deal with the problem, considering the present state of the art.

Whatever the actual concentrations of carbon monoxide now generated by the automobiles using the Franklin-Mulberry corridor are at this time, and whatever will be the actual concentrations of CO generated in 1978 by automobiles which will use I–170 in the F–M corridor, the evidence convinced the court that the one-hour and eight-hour concentrations of CO produced in the F–M corridor will be less after the construction of I–170 in that corridor than they presently are. The basic reason for this conclusion is that the production of CO decreases as the average speed of a motor vehicle increases. If the City Boulevard, which is a part of the 3–A system and of the City's Master Plan of Highways, is built (and at this time there is no reason to think the City will not do so), the CO emission concentrations will be still lower because of the greater ease of dispersal of the automobile traffic throughout the CBD that this will allow without traffic backups.

The joint development plans for the F–M corridor propose to provide new housing units, local commercial facilities, elementary schools, community health and other facilities, all sorely needed. Provision is made in the plans for future rapid rail transit lines and stations within the F–M corridor.

An additional benefit to the City from the I–170 project in the F–M corridor is the commitment of FHWA to pay 90% of the cost of replacing School No. 176. Now located in the eastern half of the F–M corridor, this school serving retarded children, and appraised at $750,000, will be replaced by a new school built to 1973 standards outside the F–M corridor at an estimated cost of $4,000,000. Construction of the new school is to begin by midsummer so that the old school can be demolished in time to avoid interfering with highway construction.

Social Security Administration (SSA) is seeking additional facilities. Its present national headquarters is located in the Woodlawn area, near the point where I–70 crosses the Beltway. RPC has expressed concern over the possibility that the expansion at the present site would cause increased congestion there. SSA has been considering locations in several states.

The City proposed to SSA that it build its new complex in downtown Baltimore at the eastern terminus of the I–170 spur, noting that a completed I–70N–170 (whatever route I–70N would take) would furnish the new complex with ready access to the Woodlawn site, which is of major concern to SSA. Both SSA and GSA have tentatively accepted the site, and architects have been hired by GSA to begin preliminary design.

The City wished SSA to locate the complex at the eastern terminus of I–170 because West Baltimore has a substantial unemployment problem and the

complex would provide many jobs.[55] A study of the area around F–M indicated a heavy coincidence between people needing employment and the civil service levels of the jobs that would be provided by the proposed SSA facility. The complex would provide jobs within walking distance for many, and generate economic activity such as shopping and restaurants.

The areas north and south of F–M corridor are residential areas, 95–100% black, most with very low incomes, unable to own automobiles; employment opportunity is an acute need. There has been some redevelopment in the general area, but because of the depressed economic and social conditions prevailing in the vicinity of the corridor, IDBC is having difficulty in securing private funds for investment in joint development projects.

The public has participated in the decision making process relating to the F–M corridor. Public hearings have been held: in 1962 on the location of an expressway in the F–M corridor, and thereafter on the condemnation ordinances necessary to be passed by the City Council for the acquisition of land in the F–M corridor; in 1967 and 1972 prior to the adoption of the 1967 and 1972 GDPs respectively; and in 1972 on the design of I–170 in the F–M corridor. These hearings have provided opportunities for public participation in varying degrees. In addition, meetings were held with local citizen groups to obtain community views on joint development proposals for the F–M corridor. The basic purpose of the UDCA approach to highway planning was an interdisciplinary one, designed to analyze and consider the economic, social and environmental impacts of proposed expressways under varying conditions. Those impacts were considered by UDCA in its work on the F–M corridor.

The responsible Federal officials in TEU and in FHWA exercised good faith objectivity in deciding to accept the supplemented final EIS on the F–M corridor and to process it on to CEQ. TEU, in refusing to approve the earlier EIS on the F–M corridor until certain questions or concerns were dealt with, demonstrated the good faith objectivity of its responsible officials. Nothing in the evidence persuades the court that the FHWA officials involved acted in bad faith to circumvent NEPA or that they did not perform their jobs objectively. As noted earlier, subjective impartiality is not required.

As of this time, IDBC has expended or committed approximately $11,000,000 for I–170 in the F–M corridor. A failure to commence construction on some part of I–170 in the F–M corridor by June 30, 1973, would obligate the City of Baltimore to refund to the Federal Government the sum of $5,196,265.[56]

If the alternative of not building the expressway were required to be more fully developed in the EIS, it would be an exaltation of form over substance. The demolition has *already* occurred in the F–M corridor; the traffic *already* exists in the F–M corridor. In short, by January 1, 1970, as well as by the time of the review of the supplemented final EIS, the project had progressed to a point where the decision to improve the existing method of moving traffic in the F–M corridor by construction of I–170 would not, ordinarily, be further debated. The question that normally would exist at that advanced stage—after location approval and the demolition that

---

55. The first phase of the development of the complex would provide employment for approximately 2,000 people; after ten years, it is anticipated that 10,000 jobs would be available there.

56. It is true that if I–170 in the F–M corridor does not later connect with an Interstate Highway, it is likely that 40% of that sum might be required to be refunded to the Federal Government in any event. That eventuality, however, is not dependent upon an imminent deadline.

followed—would not be whether to build the road, but how best to build the road.

The Fourth Circuit has indicated that the extent of change in the previously existing environment is a factor in the balancing test. In Conservation Council of North Carolina v. Froehlke, supra, the Court, in remanding the case to the District Court for a determination of whether there had been a "clear error of judgment" on the part of the agency to proceed with the project, expressed the view that no injunction should be issued *pendente lite* " \* \* \* to prevent continuing work in areas that have already been changed in an environmental sense, i. e. work in progress presently on the dam site, or in other areas where trees have been cut and land cleared." 473 F. 2d at 665.

 After balancing all the factors, the court has determined that NEPA, at the level of its operation applicable to I–170 in the F–M corridor on January 1, 1970, and thereafter, did not mandate a more complete EIS. It was, as finally supplemented, a reasonably sufficient impact statement under all the circumstances pertaining to this case.

### III

Plaintiffs also argue that the EIS for I–170 in the F–M corridor should not have been drafted by IDBC.

 For the reasons set forth by Judge Murray in National Forest Preservation Group v. Volpe, 352 F.Supp. 123 (D.Mont.1972), we believe the procedure followed here by FHWA and USDoT complied with the spirit and the letter of the law. The court finds that FHWA and TEU acted with good faith objectivity in reviewing and accepting the supplemented final EIS. FHWA participated in its preparation through frequent contact by Stackley, District Engineer of FHWA, with IDBC and SHA officials. FHWA had monitored the development of plans for an expressway in the F–M corridor since at least 1957 and for I–170 since 1969; its officials were in a position to evaluate objectively the materials gathered in the EIS by IDBC.[57]

### IV

Plaintiffs argue that an injunction should issue, prohibiting the construction of any part of the so-called 3–A system, because no finding has been made by the Secretary of USDoT or his delegate under 23 U.S.C. § 134 with respect to the 3–A system as a whole. The operative language of § 134 states:

"After July 1, 1965 the Secretary shall not approve under Section 105 of this title any program for projects in any urban area of more than 50,000 population unless he finds that such projects are based on a continuing comprehensive transportation planning process carried on cooperatively by States and local communities *in conformance with the objectives stated in this Section*." (emphasis added). 23 U.S.C. § 134(a).

The objectives of § 134 are stated as follows:

"It is declared to be in the national interest to encourage and promote the development of transportation systems, embracing various modes of transport in a manner that will serve the States and local communities efficiently and effectively. To accomplish this objective the Secretary shall cooperate with the States, as authorized in this title, in the development of long-range highway plans and programs which are properly coordinated with plans for improvements in other affected forms of transportation and

---

57. The court recognizes that proposed new CEQ Guidelines would modify existing authorized practices. Even under the proposed revision, 38 Fed.Reg. 84, ¶ 7(d), the facts in this case would not invalidate the EIS.

which are formulated with due consideration to their probable effect on the future development of urban areas of more than fifty thousand population." Id.

■ The plain language of the statute makes it clear that the "projects" referred to in § 134 are those which must be approved under § 105 as a "program for projects". As set forth in Part I of the Discussion in this opinion, the Bridwell letter was not approval of the 3–A system as a "program for projects" under § 105, nor was the 3–A system required to be approved as a "program for projects". As held in Part I, the court has determined that 3–A is not a unit having any legal status under the Federal-aid Highway Act. Accordingly, § 134 imposed no obligation upon the Secretary or his delegate to find that the 3–A system was based upon a "continuing, comprehensive transportation planning process carried on cooperatively by States and local communities * * *." [58]

Plaintiffs further contend that an injunction should issue, prohibiting the construction at this time of any part of I–170 in the F–M corridor, because § 105 approvals of stages of the F–M corridor portion of I–170 were made after invalid findings by the Secretary or his delegate under § 134.

In 1966 and again in 1972 FHWA, as the delegate of the Secretary, certified that the Baltimore Region was following a "3–C process" as required by § 134. According to the plaintiffs, the certification in 1972 was invalid because, they allege, at the time of the certification the highway planning had not given consideration to the factors required to be considered by NEPA.

■ The argument of the plaintiffs seems to be that NEPA mandates [59] a

broad construction of § 134 to require that the planning process provide for the reevaluation of unimplemented transportation plans in the light of environmental considerations. With this general statement, the court does not disagree. Section 134 itself says that a qualified planning process must be a "continuing" one, language which clearly implies ongoing study and change.

What the court cannot accept as the law, however, is plaintiffs' further contention that the required reevaluation means that all work based upon a transportation or other plan must cease until the entire framework of the plan has been restructured. If work were stopped on the 3–A system for a period of 18 months to two years, which it would probably take to reexamine the entire transportation system, it would be impossible to develop construction drawings for the remaining segments of the 3–A system in time to submit them for PS&E approval before July 1, 1975, in the absence of which the Secretary USDoT is required to remove all unapproved segments from the Interstate System. In this court's view, Congress *did not* intend, in enacting NEPA, to require the country to come to a halt while new plans were prepared based upon new criteria, all previous plans being ignored. Congress *did* intend in enacting NEPA to require that the " * * * Federal Government * * * use *all practicable means, consistent with other essential considerations of national policy,* to improve and coordinate Federal plans, functions, programs and resources * * *" [60] to preserve and enhance the environment.

While Congress has increasingly expressed concern for the preservation and enhancement of the natural environment, it has not relegated other *essential*

---

58. This is known colloquially as the "3–C process".

59. NEPA provides that " * * * to the fullest extent possible * * * the policies, regulations, and public laws of the United States shall be interpreted and

administered in accordance with the policies set forth in this chapter * * *". 42 U.S.C. § 4332.

60. 42 U.S.C. § 4331(b); emphasis supplied.

considerations in the national interest to oblivion. Congress has made a strong statement of national interest, dealing with the construction of Federal-aid highways, and particularly the Interstate System, as follows:

"(b) It is hereby declared to be in the national interest to accelerate the construction of the Federal-aid highway systems, including the National System of Interstate and Defense Highways, since many of such highways, or portions thereof, are in fact inadequate to meet the needs of local and interstate commerce, for the national and civil defense.

"It is hereby declared that the *prompt and early completion of the National System of Interstate and Defense Highways,* so named because of its primary importance to the national defense and hereafter referred to as the 'Interstate System', *is essential to the national interest* and is one of the most important objectives of this Act. It is the intent of Congress that the Interstate System be completed as nearly as practicable over the period of availability of the twenty years' appropriations authorized for the purpose of expediting its construction, reconstruction, or improvement, inclusive of necessary tunnels and bridges, through the fiscal year ending June 30, 1976, under section 108(b) of the Federal-Aid Highway Act of 1956 (70 Stat. 374), and that the entire System in all States be brought to simultaneous completion. Insofar as possible in consonance with this objective, existing highways located on an interstate route shall be used to the extent that such use is practicable, suitable, and feasible, it being the intent that local needs, to the extent practicable, suitable, and feasible, shall be given equal consideration with the needs of interstate commerce." (Emphasis supplied) [61]

NEPA cannot, therefore, be used as an excuse to postpone indefinitely, perhaps forever, the construction of all Federal-aid highways, so long as Congress deems their construction essential.

There is substantial evidence in this case that the transportation planning process in the Baltimore Region is cooperative, comprehensive and continuous. A "3–C process" cannot be limited solely to highways, or other modes of transportation, but by its very nature must involve to some extent land use planning and the overall economic, social and cultural objectives of the community.[62] A transportation system, in other words, should be planned to serve the goals of the community; the goals of the community should not be restructured to serve a transportation system.

Since 1963, the six jurisdictions in the Baltimore Region have cooperated in regional and local planning through RPC and its advisory committee, TTC.[63] Based upon numerous planning studies and public hearings, the 1967 GDP was adopted by RPC. At that time air quality analysis was in its infancy, but it was considered in the preparation of the plan. Consideration was given to rapid rail transit and other modes of transportation in the formulation of the transportation element of the 1967 GDP. In the years following the adoption of the 1967 GDP, continuous reevaluation and reexamination of the transportation elements of the plan took place, based upon studies by DMJM, MTA, Md. DoT, UDCA, and the RPC staff. Travel forecasts based upon the land use pattern adopted in the 1967 GDP were used by DMJM, UDCA and RPC in their evaluation of

---

61. 23 U.S.C. § 101(b), including amendments of December 31, 1970.

62. See Benefits of Interstate Highways, Sept. 1970, Committee on Public Works, House of Representatives, p. 24.

63. TTC is composed of the heads of the various local and state agencies which are concerned with land use and transportation. These include Md. DoT, RPC, SHA, MTA, and heads of planning, traffic engineering, and public works departments of the six jurisdictions.

transit alternatives and highway alternatives. As a result of the UDCA studies, the RPC staff recommended the 3–A configuration of expressways in Baltimore City. The PCBC and the RPC ultimately approved the 3–A configuration in 1969.

Since 1969, multi-modal transportation planning studies have been carried out by the joint staffs of SHA, MTA, and RPC, which have concluded that there is a need for both the 3–A configuration of expressways and the proposed regional rapid rail system.

The 1972 GDP was adopted by RPC after numerous public hearings and meetings throughout the Region. It had been previously analyzed as a draft by the RPC staff, by TTC, and by other committees of RPC, and was the most recent expression of the cumulative results of all the studies and decisions which had gone before. The 1972 GDP, as adopted, included both the 3–A configuration of expressways in Baltimore City and the Regional Rapid Rail Transit System.

There is substantial evidence that RPC has attempted to keep up with the state of the art in air quality analysis and its implications on the total transportation system. RPC, as a part of the continuous "3–C process", is coordinating its work closely with the 1973 Voorhees study now under way.[64]

■■■ After making a "substantial inquiry" the court holds that it was not plain error, or arbitrary or capricious, for FHWA to have concluded as it did, on behalf of the Secretary of USDoT, that there was a "3–C process" in the Baltimore Region which satisfied the requirements of 23 U.S.C. § 134.

64. See Chronological Statement of Facts for a summary of the purpose of the Voorhees study.

65. See footnote 13.

## V

Plaintiffs next contend that amended 23 U.S.C. § 128(a) [65] and NEPA require a further location hearing for I–170 in the F–M corridor to afford the public the opportunity to comment on its social and environmental effects. Location approval for an Interstate Highway in the F–M corridor was granted in 1965 based upon a location hearing held in 1962. Plaintiffs do not contend that location approval of an Interstate Highway (now designated as I–170) in the F–M corridor was in any way invalidly granted in 1965 under the law then applicable. On the contrary, their contention is that NEPA requires an additional location hearing under § 128(a) as amended even though the original location approval in 1965 was then legally valid.

In Arlington Coalition on Transportation v. Volpe, supra, the Fourth Circuit held that NEPA required a further location hearing to be conducted under amended § 128(a) in reference to a segment of I–66 traversing Arlington County in northern Virginia.[66] The Fourth Circuit applied the "costs" and "benefits" test to the circumstances present in *Arlington Coalition* and decided that "the costs of altering or abandoning the proposed location would not certainly outweigh whatever benefits might be derived therefrom".

In Ward v. Ackroyd, 344 F.Supp. 1202 (D.Md.1972), Judge Miller applied the *Arlington Coalition* test to a segment of I–70N which had previously received location approval based upon the same 1962 location hearing, as was the basis for location approval of the F–M corridor expressway. Under the circumstances of that case, a segment of I–70N traversing Leakin and Gwynns Falls Parks was required to be the subject of a further location hearing under amend-

66. This segment of I–66 was an "ongoing project". See footnote 53.

ed § 128(a) through the operation of NEPA.

In Part II of this opinion, the court discussed the balancing of the "costs" and "benefits" test which Arlington Coalition on Transportation v. Volpe, supra, established for the purpose of determining the extent to which NEPA applies to an "ongoing project". For the reasons expressed in Part II, the court has determined that NEPA does not require a new location hearing to be held under amended § 128(a) in reference to I–170 in the F–M corridor.

The circumstances of the present case are substantially different from those in *Arlington Coalition* and Ward v. Ackroyd. In each of those cases the highway in question was proposed to traverse parkland. By the enactment of 23 U.S.C. § 138 and 49 U.S.C. § 1653(f), virtually identical in language, Congress placed special emphasis upon the preservation of parkland after the original location hearings and approvals involved in *Arlington Coalition* and in *Ward*. Those statutes require the Secretary of USDoT or his delegate to disapprove any program or project which requires the use of any parkland unless "there is no feasible and prudent alternative to the use of such land" and "all possible planning to minimize harm" to the parkland has been done.[67] No environmental change had taken place in the respective parklands through grading, clearing, demolition, construction or in any other way in either *Arlington Coalition* or in *Ward*. Thus the circumstances in those cases were such that the natural environment of parklands for which Congress had expressed such special concern could still be preserved. Cf. Conservation Council of North Carolina v. Froehlke, supra, 473 F.2d at 665, where work was not enjoined in areas that had already been changed in the environmental sense by trees having been cut and land cleared.

In the present case, of course, parkland is not involved. In addition, there has already been a substantial environmental change in the F–M corridor by virtue of the fact that practically all of the buildings in the corridor have been demolished.

Another major distinction between *Arlington Coalition* and *Ward*, on the one hand, and the instant case on the other, is that in the former cases the roads there in question did not follow the route of existing major highways. In both *Arlington Coalition* and *Ward*, the proposed highways would inject heavy vehicular traffic into virgin territory, whereas in the instant case the F–M corridor is presently the major western arterial of Baltimore. Moreover, in neither *Arlington Coalition* nor *Ward*

---

67. Section 4(f) of the Department of Transportation Act of 1966 (codified as 49 U.S.C. § 1653(f)) provides:

"(f) It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After August 23, 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use."

was there an imminent construction deadline, established by 23 U.S.C. § 108.[68]

Unlike *Arlington Coalition* and *Ward*, in the present case the critical point has passed for the application of NEPA to the requirements of amended § 128(a).

## VI

Plaintiffs contend that the Clean Air Act of 1970 [69] may be violated by the construction of I–170 in the F–M corridor and that the court should therefore issue an injunction.

42 U.S.C. § 1857c—4 provides for the promulgation by EPA of national primary and secondary ambient air quality standards.[70] Pursuant to that directive EPA promulgated national primary and secondary ambient air quality standards for carbon monoxide (CO).[71] Both the primary and the secondary standards for CO are:

(a) 9 parts per million (p.p.m.) as a maximum eight-hour concentration which is not to be exceeded more than once per year, and

(b) 35 parts per million (p.p.m.) as a maximum one hour concentration which is not to be exceeded more than once per year.

The Clean Air Act provides three action methods for meeting the ambient air quality standards. One provides for the Federal regulation of emissions from "stationary sources"[72], another for the Federal regulation of emissions from the tailpipes of motor vehicles and other "moving sources" [73], and the third for State action through an "implementation plan."[74]

The term "stationary source" is defined to mean "any building, structure, facility, or installation which emits or may emit any air pollutant."[75] Under § 1857c—6 EPA is required to publish lists of categories of stationary sources and performance standards relating thereto. Assuming without deciding that a highway could be considered a stationary source under the Act, EPA has not adopted any regulations listing highways within a category of stationary sources or establishing performance standards for highways. See 40 C.F.R. § 50.1 et seq.

The action method of the Act dealing with emissions from motor vehicles and other moving sources relates to the regulation of the amounts of certain pollutants from the moving sources themselves and not to the highways upon which the moving sources may travel. See 42 U.S.C. §§ 1857f—1–1857f—12; 40 C.F.R. §§ 85.1–85.327.

As the third action method for meeting the ambient air quality standards, the Clean Air Act requires each state to prepare within a specified time an "implementation plan"[76] for the attainment,

---

68. In the instant case, a failure to meet the June 30, 1973, deadline could result in the loss of some $5,000,000 to the City.

69. 42 U.S.C. § 1857 et seq.

70. Primary ambient air quality standards are those standards the attainment and maintenance of which in the judgment of the Administrator "* * * are requisite to protect the public health." 42 U.S.C. § 1857c—4(b)(1).
 Secondary ambient air quality standards are those standards specifying a "level of air quality the attainment and maintenance of which in the judgment of the Administrator * * * is req-

uisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of * * *" certain air pollutants in the ambient air. 42 U.S.C. § 1857c—4(b)(2).

71. 40 C.F.R. § 50.8, 36 Fed.Reg. 22384 (Nov. 25, 1971).

72. 42 U.S.C. §§ 1857c—6, 1857c—7.

73. 42 U.S.C. §§ 1857f—1 to 1857f—12.

74. 42 U.S.C. § 1857c—5.

75. 42 U.S.C. § 1857c—6(a)(3).

76. 42 U.S.C. § 1857c—5.

maintenance and enforcement of the standards in each air quality control region [77] within the State. The Administrator of EPA then has four months to approve or disapprove the State's plan. In the event the State's plan does not provide for the attainment of the national primary air quality standards within at least three years,[78] the Administrator is required to disapprove the plan. If the State fails to adopt an implementation plan which meets the approval of EPA, the Administrator shall "promptly prepare and publish proposed regulations setting forth an implementation plan, or portion thereof, for a State \* \* \*."[79]

An implementation plan under the Act must include, among other things, the following:

"emission limitations, schedules, and timetables for compliance with such limitations, and such other measures as may be necessary to insure attainment and maintenance of \* \* \*" the primary and secondary ambient air quality standards, "including, but not limited to, *land-use and transportation controls*." (Emphasis supplied).[80]

EPA has promulgated regulations relating to the required content of State implementation plans. Among other things, the regulations provide that in a region where existing ambient levels of a pollutant exceed the levels specified by an applicable national standard,

"the plan shall set forth a control strategy which shall provide for the degree of emission reduction neces-

sary for attainment and maintenance of such national standard, including the degree of emission reduction necessary to offset emission increases that can reasonably be expected to result from projected growth of population, industrial activity, *motor vehicle traffic*, or other factors that may cause or contribute to increase (sic) emissions." (Emphasis supplied).[81]

The EPA regulations further provide that plans in regions

"in which attainment and maintenance of a national standard will require emission reductions in addition to those which will result from application of the Federal motor vehicle emission standards, the control strategy shall provide for application of such other measures as may be necessary for attainment and maintenance of such national standard."[82]

On April 11, 1973, EPA announced a one year extension from the 1975 models to the 1976 for automobile manufacturers to achieve emission standards under the Clean Air Act. Five days later, the Governor of Maryland submitted a plan to EPA for the Baltimore air quality control region to reduce CO levels to the primary ambient air quality standards by 1975 while stating in his letter of transmittal that the "measures outlined would result in economic chaos for the State of Maryland and its citizens" and requesting a two-year delay to 1977. His letter also included a plan for 1977. The 1975 and the 1977 plans proposed reductions of automobile use by 80% in 1975 and by 52% in 1977. The Governor

---

77. The Administrator of EPA has the authority, after consultation with appropriate State and local officials, to designate interstate or major interstate areas as "air quality control regions." 42 U.S.C. § 1857c—2(c).

78. Under certain circumstances, the Administrator of EPA may extend the three-year period in an air quality con-

trol region for not more than two additional years. 42 U.S.C. § 1857c—5(e).

79. 42 U.S.C. § 1857c—5(c).

80. 42 U.S.C. § 1857c—5(a)(2)(B).

81. 40 C.F.R. § 51.12(a).

82. 40 C.F.R. § 51.14(b).

noted in his letter that certain of the elements outlined in the 1975 plan "could be achieved by nothing short of martial law." Neither plan specified the methods by which the reductions in automobile usage would be achieved.

As of the date of the conclusion of the evidence in this case on May 29, 1973, there was no implementation plan under the Clean Air Act approved by EPA for Baltimore. Certainly there was no implementation plan for Baltimore in effect at the time the EIS for I–170 in the F–M corridor was prepared or finally approved nor when any approval, heretofore granted by a responsible federal official relating to this portion of I–170, was given.

Assuming without deciding that the construction of all highways, certain types of highways, or specific highways could be prevented through the provisions of the implementation plans dealing with "land use and transportation controls," there is no such implementation plan now in existence applicable to I–170 in the F–M corridor.

■ Plaintiffs do not contend that an injunction against the construction of I–170 in the F–M corridor should be based directly upon the Clean Air Act. Any such contention would be without merit, since there is no evidence in this case that they have given the requisite notice to the EPA Administrator and others.[83] Plaintiffs' contention is that 23 U.S.C. § 109(h) and § 109(j), when viewed in conjunction with the Clean Air Act, dictate an injunction because, plaintiffs say, the federal officials committed clear error, or failed to consider relevant matters in approving the project.

Section 109(h) provides in pertinent part as follows:

"(h) Not later than July 1, 1972, the Secretary, after consultation with appropriate Federal and State officials, shall submit to Congress, and not later than 90 days after such submission, promulgate guidelines designed to assure that possible adverse economic, social, and environmental effects relating to any proposed project on any Federal-aid system have been fully considered in developing such project, and that the final decisions on the project are made in the best overall public interest, taking into consideration the need for fast, safe and efficient transportation, public services, and the cost of eliminating or minimizing such adverse effects and the following:

(1) Air * * * pollution;
* * * * * *

"Such guidelines shall apply to all proposed projects with respect to which plans, specifications, and estimates are approved by the Secretary after the issuance of such guidelines."

Pursuant to that section, PPM 90–4 was promulgated by FHWA as the delegate of the Secretary of USDoT. Prior to its promulgation, the proposed PPM 90–4 was submitted to Congress. The chairman and ranking majority member of the Committee on Public Works of the United States Senate, in commenting upon proposed PPM 90–4, commended USDoT "for the innovative approach taken in the development of comprehensive Guidelines."

■ PPM 90–4, comprising the guidelines required by § 109(h), was promulgated on September 21, 1972. The guidelines require that the highway agency of each State submit by June 15, 1973, an "Action Plan" for the utilization of processes to be followed in the development of Federal-aid highway projects from initial system planning through "design"[84] which will accomplish the objectives of § 109(h).[85] The guidelines further provide that location

---

83. 42 U.S.C. § 1857h–2.

84. For the purposes of PPM 90–4, "Design" is defined to mean "From location

approval through the approval of plans, specifications and estimates." ¶ 3e(3).

85. PPM 90–4, p. 6.

approval shall not be given on projects after *November 1, 1973,* unless the Action Plan has been approved by FHWA.[86] The guidelines, while applicable to a proposed highway project which had not received PS&E approval by September 21, 1972, do not *require* that all PS&E approvals after that date be held up until all previous approvals, such as the location approval in this case, are completely reviewed and all prerequisites are complied with again. The guidelines place the onus upon the SHA to propose an Action Plan designed to affect the decision making process of both State and Federal officials to ensure that the objectives of § 109(h) are met. The court cannot say that such an approach by FHWA is not allowed by § 109(h), particularly in view of the fact that Congress, having had the prior opportunity to review the guidelines in PPM 90–4, took no steps to seek their amendment to change the approach.

■ There was no Action Plan in effect or required to be in effect prior to the PS&E approval of the portion of I–170 which has now received final PS&E approval. Therefore, neither § 109(h) nor PPM 90–4, as the court reads them, required State and Federal officials to start their entire decision making process over again with respect to that ongoing highway project.

Section 109(j) provides:

"(j) The Secretary, after consultation with the Administrator of the Environmental Protection Agency, shall *develop and promulgate guidelines* to assure that highways constructed pursuant to this title are consistent with any *approved plan for the implementation of any ambient air quality standard* for any air quality control region designated pursuant to the Clean Air Act, as amended." (Emphasis supplied).

■ The court has not been referred by counsel to any guidelines adopted under § 109(j), and the court's independent research has not disclosed any such guidelines. In the present case, as has previously been noted, there is no approved implementation plan under the Clean Air Act for the Baltimore region. Since there is no *approved* implementation plan for the Baltimore region, the statute, requiring consistency of highway construction with such plans, cannot reasonably be the basis for nullifying action previously taken. In short, highway construction cannot be inconsistent with an approved implementation plan when there is no approved implementation plan.

■ Moreover, the weight of the evidence does not prove that the construction of I–170 in the F–M corridor will, in fact, result in concentration of CO in excess of the primary and secondary standards of the Clean Air Act. Indeed, the evidence showed that the proposed construction would reduce the present level of CO in the F–M corridor from approximately 29 ppm to a lower level in the year 1978, which was conceded by all parties to be the worst possible year. Thereafter, the Clean Air Act and the Regulations thereunder assume that technical advances in the reduction of emissions from vehicle "tailpipes" will gradually eliminate the problem as the motor vehicle fleet becomes newer, and older vehicles, not having the more modern and required emission controls, are phased out.

There was a difference of opinion among the expert witnesses as to the actual amount of CO concentration which would actually result from the use of I–170 in the F–M corridor. Recognizing that no empirically validated formula exists for the accurate prediction of CO concentration under all conditions, the court concludes that the weight of the credible evidence does not show that the standards promulgated under the Clean Air Act will be violated by the use of I–170 in the F–M corridor.

86. PPM 90–4, ¶ 6f.

## VII

The decisions of the respective federal officials in granting design, PS&E, and other approvals of I–170 in the F–M corridor were made under Title 23 of the United States Code. The scope of judicial review of those decisions is not set out in Title 23. As in Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L. Ed.2d 136 (1971), judicial review is provided under section 701 of the Administrative Procedure Act, 5 U.S.C. § 701. *Overton Park, supra,* makes it clear that formal findings were not required to have been made by any of the appropriate federal officials in the respective decisions made by them which have been challenged in this case. 401 U.S. at 417, 91 S.Ct. 814.

Having made a substantial inquiry, the court, for all the reasons set forth in the preceding parts of this opinion, finds that the respective federal officials acted objectively and within their respective authorities, and that their respective actions in approving the supplemental final EIS on I–170 in the F–M corridor, and in granting design, PS&E and subsequent approvals for I–170 in the F–M corridor were not clearly in error, nor arbitrary and capricious, nor were they decisions which were not based upon a consideration of the relevant factors. *Overton Park, supra;* Conservation Council of North Carolina v. Froehlke, *supra;* Appalachian Power Company v. Environmental Protection Agency, *supra.*

### Conclusion

For the reasons stated in this opinion, the court concludes:

1. The applicable law does not require that an environmental impact statement be prepared for the 3–A system as such.

2. No injunction should issue in these cases, consolidated for the purpose set forth in the order of February 28, 1973 (see p. 1367 above), to prohibit further steps by the defendants, or any of them, toward construction of any roads or segments thereof in the 3–A system.

3. No declaratory judgment should be entered by the court that the Federal defendants, or any of them, have violated NEPA, the Federal-Aid Highway Act, as amended, the Clean Air Act Amendments of 1970 or the Department of Transportation Act, in taking or permitting any steps toward construction of the 3–A system as such.

4. The court should not enjoin the construction in the F–M corridor for which approval has been given by the delegate of the Secretary of the United States Department of Transportation.

5. No declaratory judgment should be entered by the court that the Federal defendants, or any of them, have violated NEPA, the Federal-Aid Highway Act, as amended, the Clean Air Act of 1970, or the Department of Transportation Act in approvals granted to date with respect to I–170 in the F–M corridor.

6. No relief should be granted by the court based upon any issue set forth in the order of this court of February 28, 1973 (the class action order) even though said issue may not be otherwise expressly decided in this opinion. As to any such issue, the plaintiffs have failed to press the same and have failed to overcome the presumption of validity of official action. Citizens to Preserve Overton Park v. Volpe, supra, at p. 415, 91 S.Ct. 814.

7. The complaint in the MAD case will be dismissed without prejudice to plaintiffs' right to file an amended complaint on or before November 1, 1973, with respect to any of the roads or segments in the 3–A configuration, raising any points which have not been theretofore decided.

Counsel are directed to prepare and submit a proposed form of judgment consistent with this opinion.

<u>Exhibit A</u>

**3-A INTERSTATE HIGHWAY CONFIGURATION**
(not to scale)

A Baltimore City Line
B Leakin Park
C Route 40
D Rosemont By-pass
E Gwynns Falls Park
F Caton Avenue-Northeastern Limit of
 Present Construction of I-95
G Pulaski Street
H Franklin-Mulberry Corridor
I City Boulevard
J Central Business District
K Eager Street-Southern Limit of Construction of
 I-83
L Inner Harbor
M Locust Point
N Fort McHenry
O Existing Harbor Tunnel
P O'Donnell Street-Southwestern Limit of Present Construction
 of I-95

[A7557]

*Exhibit B*

LIST OF ABBREVIATIONS

| | | |
|---|---|---|
| ADT | — | Average Daily Traffic |
| BAQC | — | Bureau of Air Quality Control, an agency of the Department of Health & Mental Hygiene, State of Maryland |
| BMATS | — | Baltimore Metropolitan Area Transportation Study |
| BURHA | — | Baltimore Urban Renewal & Housing Authority, a predecessor of HCD |
| CBD | — | Central Business District of Baltimore City |
| CEQ | — | Council on Environmental Quality of U. S. |
| CO | — | Carbon Monoxide |
| DMJM | — | Daniel Mann, Johnson and Mendenhall, Consulting Engineers |
| EIS | — | Environmental Impact Statement |
| EPA | — | Environmental Protection Agency |
| FHWA | — | Federal Highway Administration, an agency of the USDoT |
| F–M | — | The area bounded by Pulaski Street on the west, Franklin Street on the north, Pearl Street on the east and Mulberry Street on the south, sometimes referred to as the "F–M corridor" |
| GDP | — | General Development Plan |
| HCD | — | The Department of Housing and Community Development of the City of Baltimore |
| IDBC | — | Interstate Division for Baltimore City, a division of SHA of Md.DoT |
| JFX | — | Jones Falls Expressway |
| Md.DoT | — | Department of Transportation, State of Maryland |
| MTA | — | Interchangeably, either the former Metropolitan Transit Authority or the present Mass Transit Administration, an agency of Md.DoT |
| NEPA | — | National Environmental Policy Act |
| PAB | — | Policy Advisory Board of IDBC |
| PCBC | — | Planning Commission of Baltimore City |
| PPM | — | Policy and Procedure Memorandum |
| PPM | — | Parts per million |
| RPC | — | Regional Planning Council of the Baltimore Metropolitan Region, including five counties as well as the City |
| SHA | — | Interchangeably, the former State Roads Commission of Maryland and State Highway Administration, an agency of Md.DoT |
| TEU | — | Office of Environment and Urban Assistance of USDoT |
| TTC | — | Transportation Technical Committee, a committee of RPC |
| UDCA | — | Urban Design Concept Associates |
| UMTA | — | Urban Mass Transportation Administration, an agency of USDoT |
| USDoT | — | United States Department of Transportation |